# Exhibit E

1  Matthew Benedetto (SBN 252379)
   WILMER CUTLER PICKERING
2      HALE AND DORR LLP
   350 South Grand Ave. Suite 2100
3  Los Angeles, CA  90071
   Telephone:  (213) 443-5300
4  Facsimile:  (213) 443-5400
   matthew.benedetto@wilmerhale.com
5

6  Jonathan E. Paikin (*pro hac vice* to be submitted)
   David Gringer (*pro hac vice* to be submitted)
7  Benjamin Chapin (*pro hac vice* to be submitted)          Rodger R. Cole (SBN 178865)
   Kevin M. Lamb (*pro hac vice* to be submitted)            FENWICK & WEST LLP
8  WILMER CUTLER PICKERING                                   Silicon Valley Center
       HALE AND DORR LLP                                     801 California Street
9  1875 Pennsylvania Avenue NW                               Mountain View, CA  94041
   Washington, DC  20006                                     Telephone:  (650) 988-8500
10 Telephone:  (202) 663-6000                                Facsimile:  (650) 938-5200
   Facsimile:  (202) 663-6363                                rcole@fenwick.com
11 jonthan.paikin@wilmerhale.com
   david.gringer@wilmerhale.com                              Molly R. Melcher (SBN 272950)
12 benjamin.chapin@wilmerhale.com                            FENWICK & WEST LLP
   kevin.lamb@wilmerhale.com                                 555 California Street, 12th Floor
13                                                           San Francisco, CA  94104
   *Attorneys for Plaintiffs Intuit Inc. and*                Telephone:  (415) 875-2300
14     *Intuit Consumer Group LLC*                           Facsimile:  (415) 281-1350
                                                             mmelcher@fenwick.com
15

16

17                **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

18                     **IN THE COUNTY OF LOS ANGELES**

19
   INTUIT INC. and                              Case No.
20
   INTUIT CONSUMER GROUP LLC,
21
                            Plaintiffs,
22                                              **COMPLAINT FOR DECLARATORY**
                                                **AND INJUNCTIVE RELIEF**
23        v.

24 9,933 INDIVIDUALS,

25                          Defendants.

26

27

28

Plaintiffs Intuit Inc. and Intuit Consumer Group LLC (collectively, "Intuit"), on personal knowledge as to their own acts, and on information and belief as to all other acts based on their own and their attorneys' investigation, by and through their attorneys, allege as follows:

## INTRODUCTION

1.       Intuit brings this action to enforce its contractual right to have Defendants' arbitration demands decided in accordance with the plain text of the parties' arbitration agreement and the Consumer Arbitration Rules of the American Arbitration Association ("AAA").  Defendants, as purported consumers of Intuit's TurboTax product, "EXPRESSLY AND KNOWINGLY" agreed to resolve any disputes with Intuit in either arbitration under the AAA Consumer Arbitration Rules or in small claims court.  Defendants likewise agreed that they would not pursue any class or representative action to resolve their disputes.  Disregarding those clear contractual requirements, Defendants and tens of thousands of additional individuals represented by the same law firm, Keller Lenkner LLC, filed substantively identical, generic arbitration demands arising from their purported use of TurboTax.  After collectively filing these identical demands in clear disregard of the bar on class or representative actions, Defendants objected to Intuit's invocation of its right under the AAA rules to have qualifying claims like theirs decided in small claims court—even though that is unquestionably the cheaper, lower-risk, and more cost-effective way to resolve the merits of these individual claims and can provide all the same relief Defendants seek in the arbitrations.  More importantly, upon Intuit's election under Rule 9(b), the AAA was *required* to administratively close Defendants' cases *before any arbitrator is appointed*.  By instead leaving that issue to be resolved by thousands of arbitrators, the AAA has rendered Rule 9(b) a nullity.  Intuit seeks this Court's intervention to restore its contractual right and enforce the parties' arbitration agreements according to their terms, so as to ensure a more reasonable and efficient forum for individualized resolution of Defendants' claims.

2.       The goal of these mass arbitration filings is not to vindicate Defendants' rights, but to leverage the threat of hundreds of millions of dollars in arbitration fees to coerce a settlement that would vastly exceed the amounts Defendants paid to use TurboTax, and where nearly all of that settlement will go to Defendants' counsel, not Defendants themselves.  Defendants generally spent less than $100 to use TurboTax in any given year—indeed, many spent nothing at all—but the fees that Intuit is charged for

each individual arbitration are at least $3,200.  Intuit has already paid, under protest, nearly $3 million in filing fees for claims that, if successful, would be worth a fraction of that.  Many of these claims, which appear to have been solicited through an indiscriminate social media campaign, are so meritless as to be patently frivolous—thereby exposing the claimants to the prospect that they will be required to reimburse Intuit thousands of dollars in arbitration fees.  *See* AAA Consumer Arb. R-44(c).  And whereas, in a class action, class counsel would be entitled to no more than 33% of the recovery, under the terms of its online retention arrangement, Keller Lenkner would be entitled to keep much more.

3.     Of course, if the parties had contracted for such a regime, Intuit would be bound by the terms of its contract.  But they did not.  To the contrary, the parties agreed to arbitrate their disputes under the AAA rules, which grant to any party the right to take or remove a dispute to small claims court—before an arbitrator is appointed—where the party deems that court a better venue for the dispute.  Intuit did not elect small claims court for 564 claims, which will be proceeding in arbitration over the next year.  Intuit elected small claims court for Defendants' 9,933 claims.  At least 34,754 additional demands have been submitted to the AAA, although Keller Lenkner has not yet remitted the filing fees on behalf of those claimants.

4.     By providing the safety valve of adjudication in small claims court, the parties' arbitration agreements ensure that the "lower costs, greater efficiency and speed" realized through arbitration, *Lamps Plus, Inc. v. Varela*, 139 S. Ct. 1407, 1416 (2019) (quotation marks omitted), are not corrupted by a scheme that "would take much time and effort, and introduce new risks and costs for both sides," Defendants included, *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1623 (2018).  Small claims court represents the more efficient, less expensive, and least risky venue to resolve Defendants' claims, while affording Defendants the same opportunity to obtain full relief for any meritorious claim.

5.     The stakes of this dispute are magnified by the passage of California Senate Bill 707 ("SB 707"), which puts Intuit in the untenable position of choosing between paying tens or even hundreds of millions of dollars in improper administrative fees and facing severe, one-sided penalties, including evidentiary, case-terminating, and contempt sanctions.  This lose-lose proposition runs afoul of the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1-16, which "specifically direct[s] [courts] to respect and enforce the parties' chosen arbitration procedures," including "terms providing for

3

individualized proceedings." *Epic Sys.*, 138 S. Ct. at 1619-1621.  As the Supreme Court has repeatedly recognized, this approach preserves the virtues of arbitration—"speed and simplicity and inexpensiveness," *Lamps Plus*, 139 S. Ct. at 1416 (quotation marks omitted)—while class proceedings "make[] the process slower, more costly, and more likely to generate procedural morass than final judgment," *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 348 (2011).  Moreover, by singling out for special punishment arbitration agreements and the companies that use them, SB 707 "flout[s] the FAA's command to place [arbitration] agreements on an equal footing with all other contracts." *Kindred Nursing Ctrs. Ltd. P'ship v. Clark*, 137 S. Ct. 1421, 1429 (2017).  That discrimination against valid and binding arbitration agreements is unlawful and cannot be left to stand.

6.     Filing any lawsuit against purported TurboTax customers is not a course of action Intuit takes lightly.  Intuit has no other means, however, of restoring its rights under its arbitration agreements.  Without this Court's intervention to declare the parties' rights and enjoin Defendants from proceeding in violation of their arbitration agreements with Intuit, there will be no effective remedy to enforce those agreements.  Intuit has exhausted its remedies before the AAA, and on April 24, 2020, the AAA stated that it "will abide by any court order directed to the parties specifying the manner in which the underlying arbitrations should, or should not, proceed."  The AAA further takes the position that "it is not a necessary or proper party to litigation relating to an arbitration being administered by the AAA."

7.     To remedy the ongoing violations of Intuit's rights, the Court should declare that Intuit's invocation of Consumer Arbitration Rule 9(b) was proper and that Defendants' cases before the AAA must be administratively closed; that SB 707 is preempted by the FAA; and that Intuit cannot be compelled to arbitrate on a de facto representative basis.  In aid of the arbitrations, the Court should further enjoin Defendants from proceeding with mass arbitrations in clear violation of their agreements with Intuit.

**PARTIES**

8.     Intuit Inc. is a corporation organized under the laws of the State of Delaware with its principal place of business in Mountain View, California.  Intuit is a global technology company that helps consumers, small businesses, and the self-employed prosper by delivering financial management

and compliance products and services, including the nation's leading online tax-preparation and filing service, TurboTax.

9.     Intuit Consumer Group LLC is a limited liability company organized under the laws of the State of California with its principal place of business in San Diego, California.  Intuit Consumer Group is a wholly owned subsidiary of Intuit Inc.

10.     Defendants are 9,933 individuals who allege that they purchased a TurboTax product to prepare and file their tax returns through Intuit's commercial TurboTax website, and that their claims fall within the scope of the arbitration clause set forth in the Terms of Service.  Each Defendant is purportedly represented by Keller Lenkner LLC, who filed claims on their behalf en masse with the AAA.  Invoking AAA Consumer Arbitration Rule 9(b), Intuit elected to have each of these 9,933 claims heard in small claims court.  Defendants' names are listed in Exhibit A to this Complaint as they appear on the underlying arbitration demands.[1]

11.     Defendants are properly joined in this action because Intuit asserts against them a right to relief "arising out of the same transaction, occurrence, or series of transactions or occurrences," and because Intuit's claims raise "question[s] of law or fact common to all" Defendants.  Cal. Civ. Proc. Code § 379(a)(1).

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction pursuant to Article VI, Section 10 of the California Constitution.

13.      The amount in controversy exceeds the sum or value of $25,000 required for this Court's unlimited civil jurisdiction.

14.     The Court may grant declaratory relief pursuant to Cal. Civ. Proc. Code § 1060 because this case presents a real, substantial, and immediate controversy regarding the rights, duties, and liabilities of the parties.

---

[1] There appear to be several errors in the arbitration demands, such as names of individual claimants containing an email address, the same last name repeated twice, or a married couple.  Intuit has not altered those names except by omitting from Exhibit A in two instances what appears to be a date of birth that was erroneously included in the claimant's name.  *See* Cal. Rule of Court 1.201(a).

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

15.     Venue is proper under Cal. Civ. Proc. Code § 395(a) because some Defendants reside in Los Angeles County.

16.     This Court has personal jurisdiction over Defendants because they are domiciled in California, have consented to personal jurisdiction in California courts, or claim to have used the TurboTax product in California.

## FACTS

### I.   THE FEDERAL ARBITRATION ACT REQUIRES THAT VALID ARBITRATION AGREEMENTS BE ENFORCED ACCORDING TO THEIR TERMS

17.     The FAA commands, as a matter of federal law, that arbitration agreements are "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2.  The statute "embodies the national policy favoring arbitration and places arbitration agreements on equal footing with all other contracts."  *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 443 (2006).  Consistent with that "liberal federal policy favoring arbitration," *Concepcion*, 563 U.S. at 339 (quotation marks omitted), the FAA "preempts any state rule discriminating on its face against arbitration" as well as any rule that "disfavor[s] contracts that … have the defining features of arbitration agreements," *Kindred*, 137 S. Ct. at 1426.

18.     The FAA, however, does more than simply "require courts to respect and enforce agreements to arbitrate; it also specifically direct[s] them to respect and enforce the parties' chosen arbitration procedures."  *Epic Sys.*, 138 S. Ct. at 1621.  The Supreme Court has repeatedly recognized that the FAA requires courts to "rigorously enforce arbitration agreements according to their terms," *American Express Co. v. Italian Colors Rest.*, 570 U.S. 228, 233 (2013) (quotation marks omitted), "including terms providing for individualized proceedings" and terms specifying "the rules under which th[e] arbitration will be conducted," *Epic Sys.*, 138 S. Ct. at 1619, 1621 (emphasis and quotation marks omitted).  Under the FAA, "the task for courts" is "to give effect to the intent of the parties" as reflected in agreements like the Terms of Service and incorporated AAA rules here.  *Lamps Plus*, 139 S. Ct. at 1416 (quotation marks omitted).

## II.   INTUIT AND USERS OF TURBOTAX AGREE TO ARBITRATE THEIR DISPUTES IN BINDING INDIVIDUAL ARBITRATION OR, WHEN PERMISSIBLE, IN SMALL CLAIMS COURT

19.     As the nation's leading online tax-preparation and filing service, TurboTax allows millions of Americans to file their taxes for free each year.  In 2019, more than 12 million taxpayers used Intuit's no-cost commercial product, TurboTax Free Edition, which may be used for free by any taxpayer of any income level who files a "simple tax return" as defined by the IRS.  For taxpayers with more complex tax situations, Intuit offers a range of paid TurboTax products.

20.     In addition to its commercial TurboTax offerings, Intuit participates in the IRS Free File program—a voluntary, public-private partnership between the IRS and a consortium of online tax-preparation companies.  Intuit and the other participants in the IRS Free File program donate online tax-preparation services that Americans below a certain income threshold may use for free.  In 2019, approximately 1.2 million taxpayers making less than $66,000 prepared and filed their taxes using TurboTax services donated by Intuit, over 50 percent of those who used the program as a whole.

21.     Consumers who choose to use Intuit's commercial TurboTax services to prepare and file their taxes agree to the "Intuit Terms of Service for TurboTax Online Tax Preparation Services" (the "Terms" or "Terms of Service") when signing into those services online.  The Terms of Service for tax year 2018 are attached as Exhibit B to this Complaint.[2]

22.     Section 14 of the Terms of Service sets forth an alternative dispute resolution ("ADR") mechanism, the "interpretation and enforcement" of which is governed by the FAA.  Terms of Service § 14.  Under that provision, Intuit and users of TurboTax mutually agree to resolve disputes in binding arbitration or, when permissible, in small claims court.  The Terms provide that "[a]rbitration will be conducted by the [AAA] … under the AAA's rules," which are thereby expressly incorporated into the parties' arbitration agreements.

23.     The AAA has promulgated both Consumer Arbitration Rules and a Consumer Due Process Protocol, attached respectively as Exhibits C and D to this Complaint.  The AAA Consumer Arbitration Rules and Due Process Protocol govern arbitration by the AAA of disputes involving

---

[2] By accessing the TurboTax commercial website, users of TurboTax also agree to the TurboTax Website Terms of Use, https://turbotax.intuit.com/corp/terms-of-use.

1   consumer agreements like the Terms of Service that consumers execute with businesses for personal or

2   household use of services like TurboTax.

3          24.     Under the Consumer Due Process Protocol, "[a]ll parties are entitled to a fundamentally-

4   fair ADR," including "minimum due process standards" such as "access to small claims court" as well

5   as "reasonable costs" and "availability of court remedies."  AAA Consumer Due Process Protocol,

6   Principle 1 & Reporter's Comments.  The purported waiver by a consumer agreement of any of the

7   governing principles in the Consumer Due Process Protocol is "subject to scrutiny" to ensure that such a

8   waiver would conform to "the reasonable expectations of the parties and other judicial standards

9   governing the enforceability of such contracts."  *Id.*, Reporter's Comments.  "The AAA administers

10  consumer disputes that meet the[se] due process standards," AAA Consumer Arb. R-1(d), and "*will*

11  *exercise its authority to decline administration of arbitration demands where an arbitration clause*

12  *contains material violations of the AAA Consumer Due Process Protocol*," *e.g.*, AAA, Practice Areas:

13  Consumer, https://adr.org/consumer (last visited June 12, 2020) (emphasis in original).  As the AAA has

14  confirmed based on its own review, the Terms of Service comply with these due process standards.

15         25.     Where—as in the Terms of Service—the parties have provided for arbitration by the

16  AAA in a consumer agreement, they "shall have made the[] *Consumer Arbitration Rules* … a part of

17  their arbitration agreement," and "the application of the AAA's rules … shall be an essential term of

18  their consumer agreement."  AAA Consumer Arb. R-1.

19         26.     AAA Consumer Arbitration Rule 9 provides:

20         If a party's claim is within the jurisdiction of a small claims court, either
21         party may choose to take the claim to that court instead of arbitration as
           follows:

22         (a)  The parties may take their claims to small claims court without first
23              filing with the AAA.

24         (b)  After a case is filed with the AAA, but before the arbitrator is formally
                appointed to the case by the AAA, a party can send a written notice to
25              the opposing party and the AAA that it wants the case decided by a small
                claims court.  After receiving this notice, the AAA will administratively
26              close the case.

27         (c)  After the arbitrator is appointed, if a party wants to take the case to small
28              claims court and notifies the opposing party and the AAA, it is up to the

---

8

arbitrator to determine if the case should be decided in arbitration or if the arbitration case should be closed and the dispute decided in small claims court.

AAA Consumer Arb. R-9.

27.     The Consumer Due Process Protocol further makes clear that "all parties retain the right to seek relief in a small claims court for disputes or claims within the scope of its jurisdiction," explaining that such courts are "the least expensive and most efficient" judicial means for resolving "claims for minor amounts," and "typically provide a convenient, less formal and relatively expeditious judicial forum for handling such disputes," with "the benefit, where necessary, of the coercive powers of the judicial system."  AAA Consumer Due Process Protocol, Principle 5 & Reporter's Comments.

28.     Consumer Arbitration Rule 9 effectuates that due process principle by providing three distinct ways—corresponding to different points in the arbitration—that parties to consumer arbitration agreements may avail themselves of the option to have a dispute resolved in small claims court:  First, Rule 9(a) allows a party to bring its claim in small claims court instead of filing it with the AAA. Second, where the claimant has chosen to file the case with the AAA, Rule 9(b) empowers either party—unilaterally—to elect to remove the case to small claims court *before* the AAA has appointed an arbitrator to the case.  The AAA *must* close the case upon receipt of a party's notice of election.  Finally, where the AAA has already appointed an arbitrator, either party may request to remove the case to small claims court under Rule 9(c), but at that point, the AAA itself does not administratively close the case. Rather, the appointed *arbitrator* has the power to decide whether to close the arbitration or allow it to proceed.

29.     Under the Consumer Due Process Protocol, arbitration agreements like § 14 of the Terms of Service should give consumers "notice of the option to make use of applicable small claims court procedures as an alternative to binding arbitration in appropriate cases."  AAA Consumer Due Process Protocol, Principle 11.  The Protocol gives the following "example of a possible notice":  "You thus GIVE UP YOUR RIGHT TO GO TO COURT to assert or defend your rights under this contract (EXCEPT for matters that may be taken to SMALL CLAIMS COURT)."  *Id.*, Practical Suggestions.

30.     Consistent with that principle of notifying consumers of their right under Rule 9 to take claims to small claims courts in lieu of arbitration, Intuit's Terms of Service for TurboTax users provide

9

that "ANY DISPUTE OR CLAIM RELATING IN ANY WAY TO THE SERVICES OR THIS AGREEMENT WILL BE RESOLVED BY BINDING ARBITRATION, RATHER THAN IN COURT, except that you may assert claims in small claims court if your claims qualify."  Terms of Service § 14. That provision does not reference—let alone expressly waive—any other right by either party.

31.     In contrast, the Terms do require that consumers "EXPRESSLY AND KNOWINGLY" "WAIVE THE RIGHT TO PARTICIPATE IN A CLASS ACTION OR LITIGATE ON A CLASS-WIDE BASIS," and "AGREE THAT ANY AND ALL DISPUTES MUST BE BROUGHT IN THE PARTIES' INDIVIDUAL CAPACITY AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS OR REPRESENTATIVE PROCEEDING."  Terms of Service § 14.

32.     In exchange, Intuit agrees to pay the AAA's filing fees for consumers who are unable to pay them and to "reimburse all such fees and costs for claims totaling less than $75,000 unless the arbitrator determines the claims are frivolous."  Terms of Service § 14.  Under the AAA's fee schedule, consumers pay $200 to file a case absent a fee waiver, and Intuit pays a $300 filing fee, plus an additional $1,400 case management fee, as well as a minimum of $1,500 in arbitrator compensation. *See* AAA Consumer Arb. R-4, 5, Costs of Arbitration.  Intuit agrees not to seek its own attorney's fees and costs unless the consumer's claims or defenses are found to be frivolous.  Terms of Service § 14. Upon determining that either party's claim is "patently frivolous," the arbitrator may require that party to pay compensation, expenses, and fees associated with the arbitration.  AAA Consumer Arb. R-44(c).

33.     In addition to the fail-safe under Rule 9 that enables parties to take qualifying claims to small claims court, the Terms of Service provide that "[n]otwithstanding anything to the contrary, any party to the arbitration may at any time seek injunctions or other forms of equitable relief from any court of competent jurisdiction."  Terms of Service § 14.

III.     CALIFORNIA ENACTS SENATE BILL 707

34.     Following the execution of the arbitration agreements at issue in this case, the State of California enacted Senate Bill 707 into law.  *See* 2019 Cal. Legis. Serv. Ch. 870 (S.B. 707) (West).  The law took effect on January 1, 2020.

35.     SB 707 purports to ensure that employees and consumers who are subject to arbitration agreements have judicial remedies when certain fees are not paid by the "[d]rafting party," defined as

"the company or business that included a predispute arbitration provision in a contract with a consumer or employee."  Cal. Civ. Proc. Code § 1280(e).

36.     In reality, SB 707 on its face discriminates against valid arbitration agreements and interferes with the enforcement of those agreements as written.

37.     To start, SB 707 applies only to arbitration agreements and establishes severe, one-sided sanctions for a company's non-payment of arbitration fees.  If a "drafting party" fails to pay its fees "to initiate an arbitration proceeding" within 30 days of the due date, by operation of state law, that party "is in material breach of the arbitration agreement, is in default of the arbitration, and waives its right to compel arbitration"—regardless of the company's reason for not paying the fees.  Cal. Civ. Proc. Code § 1281.97(a).  The party's "breach," in turn, triggers statutory rights and remedies for the consumer, including the right to withdraw from arbitration and proceed in court, or to "[c]ompel arbitration in which the drafting party shall pay reasonable attorney's fees and costs related to the arbitration."  *Id.* § 1281.97(b).

38.     If the consumer chooses to go to court, SB 707 likewise *requires* the court to "impose a monetary sanction … by ordering the drafting party to pay the reasonable expenses, including attorney's fees and costs, incurred … as a result of the material breach."  Cal. Civ. Proc. Code § 1281.99(a).  The court may also impose evidentiary, case-terminating, or even contempt sanctions, *unless* it finds that the company "acted with substantial justification or that other circumstances make the imposition of the sanction unjust."  *Id.* § 1281.99(b).

39.     If a company later fails to pay fees "to continue the arbitration," that failure again results in material breach, default, and waiver, creating similar statutory rights and remedies for the consumer—again, without regard to the reason for non-payment.  Cal. Civ. Proc. Code § 1281.98.  If the consumer chooses to withdraw from the arbitration and go to court, SB 707 not only requires the same monetary sanctions above, but also allows the consumer "to recover all attorney's fees and all costs associated with the abandoned arbitration," regardless of "the merits in the underlying action or arbitration."  *Id.* § 1281.98(c)(1).

40.     SB 707 places companies in a Hobson's choice in situations where a party manufactures a dispute as to whether arbitration fees are owed, as is the case in these proceedings.  Here, Defendants'

position (which the AAA has accepted) is that fees must first be forfeited for these 9,933 cases in order for arbitrators to be appointed to decide, in each case, whether the fees were owed to initiate the cases and appoint those arbitrators in the first place.  Backed by the threat of draconian sanctions, Intuit is left with little option other than to forfeit those substantial fees without any semblance of a fair, impartial, or orderly adjudication.  Indeed, faced with that very choice, Intuit paid nearly $3 million in fees that are not owed.

41.     In contrast, SB 707 imposes no sanction on consumers who fail to pay arbitration fees—much less the type of sweeping sanctions imposed on companies.

42.     SB 707 thus displaces generally applicable contract law regarding what constitutes a material breach, and the remedies for breach, with an arbitration-specific regime that heaps harsh and asymmetric penalties on companies like Intuit that include arbitration provisions in consumer contracts like the Terms of Service.  On its face, the law singles out arbitration agreements for discriminatory treatment, in contravention of the FAA's directive that such agreements be placed "on equal footing with all other contracts." *Cardegna*, 546 U.S. at 443.  Such a punitive regime will have "a likely deterrent effect on the use of such agreements" in the first place, *Chamber of Commerce of U.S. v. Becerra*, 2020 WL 605877, at *13 (E.D. Cal. Feb. 7, 2020), thereby erecting a substantial obstacle to the FAA's "liberal federal policy favoring arbitration," *Concepcion*, 563 U.S. at 339 (quotation marks omitted).

43.     SB 707's mandatory fee-shifting regime would also displace the AAA rules governing remedies for non-payment and fee-shifting, *see* AAA Consumer Arb. R-44(c), 54—rules incorporated into many consumer arbitration agreements like the Terms of Service.

## IV.  KELLER LENKNER FILES TENS OF THOUSANDS OF MASS ARBITRATION DEMANDS AGAINST INTUIT

44.     Defendants are among the tens of thousands of individuals whom a single law firm, Keller Lenkner, purports to represent in successive waves of mass arbitrations filed against Intuit with the AAA.  In addition to approximately 125,000 Intuit customers this firm claims to represent individually in connection with Intuit, Keller Lenkner has filed separate mass arbitrations involving

thousands of other individuals against companies like CenturyLink, FanDuel, DraftKings, Postmates, Lyft, and DoorDash.[3]

45.     In each case, Keller Lenkner's business model is the same.  Through online advertising and social media posts, the firm solicits clients supposedly bound by individual arbitration agreements, conducting minimal (if any) diligence on the merits of claims.  In at least some cases, Keller Lenkner has partnered with Troxel Law LLP, a purported law firm that does not appear to work on the cases, but instead solicits clients through websites advertising generic allegations against companies and promising that the firm "will start working" on a client's potential claim as soon as she answers "a couple questions" that "only require 2 minutes of [her] time."[4]

46.     Once Keller Lenkner has amassed a list of clients with purported claims against one of its corporate targets, it approaches the company and threatens to file thousands of arbitration demands simultaneously—which, under the Consumer Arbitration Rules, trigger at least $3,200 in fees the company is responsible for paying the AAA to administer each arbitration regardless of the merits. Keller Lenkner then makes clear through its communications with the company that the only way to avoid those fees is for the company to agree to a massive settlement well in excess of the underlying

---

[3] Based solely on publicly available court filings, Keller Lenkner has brought at least 28,000 arbitration demands against these other companies.  *See* First Am. Compl. ¶ 8, *Postmates Inc. v. 10,356 Individuals*, No. 2:20-cv-2783 (C.D. Cal. Apr. 2, 2020) (Dkt. 7) (10,356 demands filed in February 2020); Pet. to Compel Arb. ¶¶ 1, 3, *Adams et al. v. Postmates, Inc.*, No. 4:19-cv-3042 (N.D. Cal. June 3, 2019) (Dkt. 1) (5,257 demands filed in spring 2019); Pet. to Compel Arb. ¶¶ 1, 3, *McClenon et al. v. Postmates Inc.*, No. 1:19-cv-6415 (N.D. Ill. Sept. 26, 2019) (Dkt. 1) (200 demands filed in May 2019); Suppl. Br. in Supp. of Mot. for Prelim. Approval of Class Action Settlement 3, *In re CenturyLink Sales Practices & Secs. Litig.*, No. 17-md-2795 (D. Minn. Jan. 10, 2020) (Dkt. 508) (1,000 demands filed in November 2019); Pet. to Stay Arbs. ¶ 6, *FanDuel Inc. v. Badii et al.*, No. 650211/2020 (N.Y. Sup. Ct. Jan. 9, 2020) (Dkt. 1) (1,000 demands filed in October 2019); Am. Pet. to Compel Arb. ¶¶ 1, 5, *Abernathy et al. v. Doordash, Inc.*, No. 3:19-cv-7545 (N.D. Cal. Dec. 23, 2019) (Dkt. 150) (5,879 demands filed in August and September 2019); Defs.' Ltr. 1, *In re Daily Fantasy Sports Litig.*, No. 1:16-md-02677 (D. Mass. Oct. 21, 2019) (Dkt. 399) (1,000 demands filed against DraftKings in fall 2019); Pet. to Compel Arb. ¶¶ 2-3, *Abarca et al. v. Lyft, Inc.*, No. 3:18-cv-07502 (N.D. Cal. Dec. 13, 2018) (Dkt. 1) (3,420 demands filed in late 2018).  That number of demands far exceeds the capacity of the AAA, which administered fewer than 6,000 consumer cases altogether in 2018.  *See* AAA, 2018 Annual Report 11 (May 2019), https://adr.org/sites/default/files/document_repository/AAA_2018_Annual_Report_and_Financial_Statements.pdf.

[4] *E.g.*, https://attorney.dailyfantasysportsclaim.com/sign-up; *see* Declaration of Andrew M. Unthank ("Unthank Decl.") ¶¶ 21-25, *In re CenturyLink Sales Practices & Secs. Litig.*, No. 17-md-2795 (D. Minn. Jan. 10, 2020) (Dkt. 512).

liabilities.  The fact that it is the "nuisance" value, rather than the merits of the claims, driving the settlement demand is made plain.  If the company refuses, Keller Lenkner submits successive waves of generic arbitration demands to maximize its leverage, which thus depends entirely on the firm's ability to aggregate an increasingly large number of related demands rather than the likelihood of success in arbitrating any individual case.

47.     Keller Lenkner has followed the same playbook against Intuit.  On information and belief, prior to contacting Intuit on behalf of tens of thousands of individuals the firm now claims to represent, Keller Lenkner partnered with Troxel Law to induce Defendants and other prospective clients to sign up through a website that asked a single screening question:  "Select the companies you paid to file your taxes."  *See* https://signup.turbotaxclaims.com/free-filing-claim (last visited June 12, 2020). The website prompted users to select one or both of two options, TurboTax and H&R Block, when entering their contact information.  Consumers who sign up through the website are emailed "a couple questions about when [they] paid TurboTax or H&R Block."  *Id*.  The website touts that the entire process "take[s] about 2 minutes to finish."  *Id*.

48.     The $200 filing fee associated with initiating an arbitration appears to be financed by the law firm or its investors.  The client-recruitment website promises that "[s]igning up is straightforward and costs nothing," and that claimants need only fill out a form and "[t]hat's it."  *Id*.  While the claimant needs to pay nothing, he or she also stands to gain nothing.  If Keller Lenkner employed a retention agreement here similar to that used in its other cases, the firm stands to take roughly $750 off the top of any arbitral award—a sum well in excess of any likely recovery on any claim here.  *See* Unthank Decl. ¶ 26.

49.     On October 1, 2019, Keller Lenkner filed 1,000 arbitration demands against Intuit with the AAA, invoking the individual arbitration provision in the Terms of Service for tax returns prepared using TurboTax in 2019.  All of those demands, as well as the thousands of additional demands Keller Lenkner has subsequently filed, are premised on identical generic allegations that Intuit, in offering its

commercial TurboTax services to consumers, failed to disclose to qualifying taxpayers the availability of TurboTax services donated by Intuit to the IRS-administered Free File program.[5]

50.     Shortly after filing its first 1,000 demands, Keller Lenkner contacted Intuit, claiming to represent approximately 42,000 clients with claims against Intuit and proposing to mediate those claims to reach a global settlement.  Intuit agreed to attempt to mediate the dispute, and a mediation session was scheduled for February 6, 2020.

51.     After receiving the names and contact information from Keller Lenkner for its approximately 42,000 clients, Intuit carefully reviewed each individual's TurboTax history and determined that the overwhelming majority of the claims were frivolous.  Intuit informed Keller Lenkner that it was unable to identify 1,349 as TurboTax users and that, for tax year 2018, 6,710 filed their taxes for free despite alleging that they were deceived into paying to use TurboTax last year; another 402 used the Free File offering, the very product they allege they were steered away from; and 7,310 were not eligible to use the Free File offering last year.  In addition, Intuit found that 13,895 others used TurboTax in a way belying any intention to use the Free File offering, either because they used TurboTax after having used a Free File offering in a prior year or because they voluntarily

---

[5] Specifically, each demand contains the following boilerplate description of the claim:

> TurboTax is the nation's leading provider of online tax filing services. Since 2002, TurboTax has committed to the IRS to provide free online tax filing for low-earning taxpayers in exchange for the IRS agreeing not to provide competing online tax filing services.  Claimant was eligible for free filing through TurboTax's Free File Program.  Although TurboTax knew that Claimant was eligible for the Free File program, TurboTax did not make Claimant aware of that program.  Instead, TurboTax channeled Claimant into its paid products by offering those products to Claimant while omitting any reference on its website to the Free File program. Furthermore, TurboTax knowingly, intentionally, and willfully misled Claimant by fraudulently representing that Claimant was not eligible for free online tax filing through TurboTax.  TurboTax's fraud was particularly egregious because TurboTax repeatedly took advantage of millions of low-income taxpayers like Claimant, in violation of the commitment TurboTax made to the IRS in order to prevent the IRS from offering its own free service.  TurboTax's conduct constitutes fraud and unjust enrichment at common law.

The only variation in that description—beyond the claimant's name—is that each asserts that Intuit's "conduct also violates" the consumer protection law of the claimant's home state.

purchased add-on products unavailable through Intuit's Free File offering or through the TurboTax Free Edition.[6]

52.     In anticipation of the scheduled mediation, Intuit shared its analysis with Keller Lenkner. Intuit explained that based on the tax-filing histories of the firm's clients, less than 20% had non-frivolous claims and that even those lacked merit.

53.     On January 28, 2020, within days of receiving that analysis, Keller Lenkner withdrew from the scheduled mediation and simultaneously filed a second wave of 9,497 new arbitration demands against Intuit with the same boilerplate allegations.

54.     On March 10, Keller Lenkner submitted a third wave of 34,754 generic individual demands—bringing the total number of such demands to 45,251.[7]

55.     Keller Lenkner has subsequently informed Intuit that it claims to represent approximately 125,000 clients altogether.  Were all 125,000 cases to proceed in arbitration, Intuit would face at a minimum $400 million in fees, including $37.5 million in initial filing fees before arbitrators are even appointed to hear those cases and long before any applicable fee-shifting based on an arbitrator's determination that a party's claim is patently frivolous.

## V.     DESPITE INTUIT'S ELECTION TO HAVE DEFENDANTS' CASES DECIDED IN SMALL CLAIMS COURT, THE AAA HAS REFUSED TO ENFORCE THE TERMS OF THE PARTIES' AGREEMENT

56.     In response to the first two waves of generic and identical arbitration demands, Intuit exercised its contractual right to have Defendants' individual arbitration demands decided in small claims court.  Under Rule 9(b), which is incorporated into the Terms of Service, the parties may unilaterally bypass arbitration in favor of small claims court by serving a written notice of election "[a]fter a case is filed with the AAA, but before the arbitrator is formally appointed."  AAA Consumer

---

[6] More recently, on further review of the roughly 45,000 clients now identified by Keller Lenkner, Intuit has been unable to identify 4,498 as TurboTax customers.  Of those who have been identified, 9,596 are asserting patently frivolous claims because they used Intuit's Free File offering, were ineligible to use that product, or used a commercial TurboTax product but filed their federal and state returns entirely for free.  An additional group of approximately 18,000 clients had tax situations or preferences that make it highly unlikely they would have used Intuit's Free File offering, as they now claim.

[7] Unlike with its first two waves of arbitration demands, Keller Lenkner has not paid its initial filing fees for its third-wave demands, which are not "considered properly filed" until those fees are paid.  AAA Consumer Arb. R-2.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Arb. R-9(b).  Intuit served notice of its election as to 943 first-wave demands on February 10, serving a similar notice as to 8,990 second-wave demands on March 13.  Intuit then paid its filing fees as to the remaining 564 cases proceeding in arbitration.

57.     The AAA, however, has not "administratively close[d]" Defendants' cases—as Rule 9(b) mandates.  AAA Consumer Arb. R-9(b) ("After receiving this notice, the AAA will administratively close the case.").  To the contrary, despite having no discretion to allow these cases to proceed in arbitration, the AAA invited Keller Lenkner to address Intuit's notice.

58.     Less than 48 hours after Intuit notified the AAA and Defendants of its election, Keller Lenkner—whose business model is based entirely on leveraging fees triggered by filing large numbers of arbitration demands—objected on behalf of all its clients collectively.  It did not disagree that Rule 9(b) directs the AAA to administratively close cases when properly invoked, but the Terms of Service, it asserted, "eliminat[ed] Intuit's right to invoke Rule 9(b)" by providing that "'*ANY* DISPUTE OR CLAIM … WILL BE RESOLVED BY BINDING ARBITRATION, RATHER THAN IN COURT, except that *you* may assert claims in small claims court if your claims qualify.'"  According to Keller Lenkner, that language "departs from the default Rules" by converting rights afforded equally to both parties under Rule 9 into a special privilege available only to one party:  the consumer.

59.     Alternatively, Keller Lenkner argued that this language was at least ambiguous and therefore raised an issue of arbitrability to be decided by the arbitrator.

60.     In several responsive submissions, Intuit explained the numerous defects in Keller Lenkner's reading of this language.

61.     *First*, as Intuit explained, the clear purpose of the language seized on by Keller Lenkner is to notify *consumers* of *their* rights, not to abrogate Intuit's rights.  Indeed, far from displacing default rules or indicating any express waiver of a right, the language effectuates the Consumer Due Process Protocol, which directs that "[c]onsumers should be given … notice of the option to make use of applicable small claims court procedures as an alternative to binding arbitration."  AAA Consumer Due Process Protocol, Principle 11(c).

62.     *Second*, Intuit explained that if Keller Lenkner were correct that this notice to consumers somehow abrogated one party's access to small claims court under Rule 9, the agreement itself would violate the AAA's Consumer Due Process Protocol, requiring the AAA to decline to administer the cases altogether because "a '[k]ey [p]rovision[] of the Due Process Protocol' is that '[*a*]*ll parties* retain the right to seek relief in small claims court'" (quoting AAA Consumer Arbitration Fact Sheet, attached as Exhibit E to this Complaint).  The remedy for such material violations of the Consumer Due Process Protocol, Intuit underscored, would not be to reject Intuit's election under Rule 9(b) but to close *all* of Keller Lenkner's cases, including those that Intuit has allowed to proceed in arbitration without objection.

63.     *Third*, Intuit argued that the application of Rule 9(b) cannot be an issue of arbitrability because, by its terms, that rule governs "before the arbitrator is formally appointed" and mandates that the AAA itself "will administratively close the case[s]."  By contrast, Intuit noted, removal to small claims court "[a]fter the arbitrator is appointed" is governed by a separate provision—Rule 9(c)—which leaves "it … up to the arbitrator to determine if the case should be decided in arbitration or if the arbitration case should be closed and the dispute decided in small claims court."  Rule 9(b) affords the AAA no such discretion.

64.     Without addressing any of Intuit's arguments, the AAA declined to close Defendants' cases.  On March 6, the AAA informed the parties that it had "determined that the issues presented are arbitrability disputes that must be resolved by an arbitrator(s)," and that it would "proceed with administration of each individual case under the Consumer Rules."  In other words, Intuit must forfeit the fees for each of Defendants' 9,933 cases before the question of whether those fees were owed can be determined.  The AAA provided no further reasoning for its decision.

65.     Intuit repeatedly sought reconsideration by the Administrative Review Council or other senior AAA leadership.  The Administrative Review Council is charged with resolving "administrative issues that arise in the AAA's large, complex domestic cases," including "whether the filing requirements contained in the AAA Rules have been met."  Administrative Review Council, https://www.adr.org/arc (last visited June 12, 2020).

66.     On April 9, the AAA reiterated its March 6 decision that the Rule 9(b) issue is a question of arbitrability for appointed arbitrators to decide—after Intuit pays its fees—and rejected Intuit's request for review by the Administrative Review Council, making clear that further review is unavailable within the AAA administrative process.

67.     Moreover, the AAA's efforts to chart a middle course have been blocked by Keller Lenkner.  "In the interest of providing the parties with an efficient process" that avoids thousands of arbitrators deciding the Rule 9(b) issue in thousands of individual arbitrations, the AAA proposed in its March 6 letter "the appointment of a single arbitrator to determine this issue for all the disputes," but only "if [the] parties agree[d]" to that proposal.  During an April 3 administrative teleconference, the AAA again asked whether the parties were willing to have a special master decide the Rule 9(b) issue for all the pending arbitrations.

68.     Although the appointment of a special master would unquestionably be a quicker and more cost-effective means to resolve the Rule 9(b) issue once, rather than have the same issue decided tens of thousands of times—with potentially inconsistent results—Keller Lenkner rejected that proposal on behalf of all its clients without explanation.

69.     The AAA notified Intuit on March 6 that its payment of over $3 million in initial filing fees for Keller Lenkner's first- and second-wave demands was due on March 20, and would need to be received by April 19, with no extensions, to comply with SB 707 and avoid having the cases closed.

70.     On April 17, having exhausted all opportunities for internal review within the AAA, Intuit paid its outstanding balance in initial filing fees for Defendants' cases under protest.

71.     On April 24, the AAA advised that it would "abide by any court order directed to the parties specifying the manner in which the underlying arbitrations should, or should not, proceed."  The AAA also underscored that it "did conduct an administrative review of the parties' arbitration agreement at the time of filing and determined that it substantially and materially complies with the due process standards of the Consumer Due Process Protocol," thereby further corroborating Intuit's position that the arbitration agreement did not waive any party's right to elect small claims court before the appointment of an arbitrator.

72. On May 27, the AAA notified the parties that it would initiate all 10,467 cases currently pending over six weeks starting the week of June 1—with 100 cases in the initial wave, followed by waves of 900, 1,500, 2,000, 2,500, and 3,467 cases. The AAA stated that it would bill Intuit for each wave on a single invoice requiring payment of all case management fees for that wave ($1,400 per case) within 60 days of the initiation letter, and that it would appoint arbitrators in batches of 1,000 cases, with the initial deposit for each batch ($1,500 per case) due within 15 days of the appointment. Thus, although the AAA has given no assurances that it has the administrative capacity to resolve the thousands of cases here in a timely fashion, Intuit will be required to pay over $30 million in case-initiation fees by the beginning of November—including over $28 million in fees for Defendants' 9,933 cases, which Intuit elected to have resolved in small claims court.

73. By refusing to enforce the plain terms of the parties' arbitration agreements and Rule 9(b), the AAA has set Intuit on an inexorable path that will require it to pay hundreds of millions of dollars in arbitration fees just to initiate arbitral proceedings for the 125,000 individuals Keller Lenkner claims to represent. And Intuit will, once again, be coerced into paying those fees under threat of severe, one-sided sanctions imposed by an invalid state law.

## VI. DEFENDANTS' ARBITRATION DEMANDS ARE PART OF A DE FACTO REPRESENTATIVE PROCEEDING PROHIBITED BY THE TERMS OF SERVICE

74. Regardless of whether the parties' disputes are resolved in binding arbitration or small claims court, Defendants, in agreeing to the Terms of Service, "EXPRESSLY AND KNOWINGLY" waived the right to participate "IN ANY PURPORTED CLASS OR REPRESENTATIVE PROCEEDING," and agreed that "ALL DISPUTES MUST BE BROUGHT IN THE PARTIES' INDIVIDUAL CAPACITY." Terms of Service § 14. A "basic precept" of the FAA is "that arbitration is a matter of consent, not coercion." *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 681 (2010) (quotation marks omitted). Thus, in "construing an arbitration clause," courts "must give effect to the … expectations of the parties." *Id*. at 682 (quotation marks omitted). Intuit has not consented to arbitrate disputes in *any* representative proceeding, and the parties' expectations were that disputes would be resolved bilaterally on an individualized, not a class-wide, basis.

75.     As courts have recognized, purportedly individual arbitrations may constitute de facto class arbitration prohibited by the parties' agreement where the chief virtue of bilateral arbitration—"its informality"—has been displaced by the vices characteristic of class litigation and arbitration, including added procedural complexity, time, and cost, as well as the pressure to "settl[e] questionable claims" based on "even a small chance of a devastating loss." *AT&T Mobility LLC v. Bernardi*, 2011 WL 5079549, at *6-7 (N.D. Cal. Oct. 26, 2011) (quoting *Concepcion*, 563 U.S. at 348, 350). The test is one of "substance and function," not form. *AT&T Mobility LLC v. Smith*, 2011 WL 5924460, at *5 (E.D. Pa. Oct. 7, 2011). Defendants' arbitration demands, although "nominally filed" as individual demands, "bear all the critical hallmarks of … representative actions." *Bernardi*, 2011 WL 5079549, at *6.

76.     The demands belong to a well-defined class of generic arbitration demands filed by a single law firm purporting to act on behalf of thousands of similarly situated individuals. Each demand is substantively identical, devoid of any individualized allegations or information about the claimant. And each advances the same theory of liability, seeking the same types of relief across the entire class. The term "representative," by "common usage," extends precisely to situations like this in which "functionally identical arbitrations" are pursued in concert. *Smith*, 2011 WL 5924460, at *6-7.

77.     The practical effect of such mass arbitrations is also to abandon the "streamlined, efficient and less expensive dispute resolution mechanism" of bilateral arbitration, *Securitas Sec. Servs. USA, Inc. v. Superior Court*, 234 Cal. App. 4th 1109, 1118 (2015), in favor of what promises to be a years-long "procedural morass," *Concepcion*, 563 U.S. at 348. The AAA originally indicated to Intuit that it could open about 50 cases per week—a rate at which it would take well over *17 years* for the AAA merely to *initiate* (*i.e.*, to compose initiation letters for and assign case numbers and internal AAA administrators to) the first three waves of arbitration demands that Keller Lenkner has filed. The AAA subsequently stated that it could double its administrative capacity and initiate 100 new cases per week by assigning multiple cases to the same arbitrators. Even at that projected rate, it would be the better part *of a decade* before many cases are opened, let alone decided. More recently, the AAA has notified the parties of its intent to "open" all of the 10,467 cases currently pending over six weeks, thus triggering Intuit's obligation to pay the AAA immediately, but providing no assurances that those cases will be resolved any more expeditiously.

78.     Until very recently, the AAA, for its part, has largely administered these cases as a single consolidated action—assessing the fees Intuit owes as a lump sum on a non-itemized invoice and assigning a single administrator who has resolved all administrative disputes globally under a single case number.  Intuit has objected to the AAA's consolidated fee assessment as inconsistent with the parties' agreement to arbitrate on an individualized basis.  But under threat of SB 707's penalties for non-payment, Intuit has no choice but to pay those fees for cases that will take years to be resolved.

79.     Here, as in class actions generally, the "small stake[s]" for each individual claimant mean that the lawyers are the ones effectively "in charge."  *Blue Cross Blue Shield of Mass., Inc. v. BCS Ins. Co.*, 671 F.3d 635, 640 (7th Cir. 2011).  Under the standardized retainer agreement used by Keller Lenkner in mass arbitrations against CenturyLink, clients agreed to pay a $750 flat-rate fee from any settlement in exchange for the firm's agreement to file individual arbitrations asserting generic allegations against the company.  *See* Unthank Decl. ¶ 26.  The agreement also authorized Keller Lenkner "to pursue resolution of … claims outside of or before initiating arbitration," and further "instruct[ed]" the firm to accept any "full-value" settlement above a specified threshold amount—$100 there—"without further direction or authorization."  *Id.*[8]

80.     On information and belief, Keller Lenkner has used substantially the same type of standardized retainer agreement for Defendants here.  Under such an agreement, any settlement agreement would almost certainly go entirely to cover Keller Lenkner's fees, with little or nothing going to Defendants themselves.

81.     By filing thousands of generic arbitration demands—with the threat to file tens of thousands more—Keller Lenkner has opted entirely for a collective strategy whose single individualized feature is that each demand triggers hundreds or thousands of dollars in arbitration fees that Intuit must pay to the AAA.  But only by purporting to speak for the entire class of claimants in those nominally individual arbitrations is Keller Lenkner then able to aggregate the fees as leverage to demand a global settlement.  That type of aggregation leads to what the Supreme Court has described as "the risk of 'in terrorem' settlements" typical of class actions and class arbitration.  *Concepcion*, 563 U.S. at 350.  In

---

[8] The agreement defined "full-value" settlement also to require the release of specified claims against the company and non-disclosure of the settlement terms.  Unthank Decl. ¶ 26.

this case, however, the pressure to settle is intensified by the certainty of massive arbitration fees that the company will owe once the arbitration demands are filed, rather than the mere risk of massive liability if the company loses on the merits.

82.     Indeed, the fact that the vast majority of Defendants' claims are frivolous—for example, because the taxpayer filed her taxes for free—only underscores the de facto representative nature of the proceeding here.  The risk of fee-shifting where the arbitrator determines that a party's claim is "patently frivolous" makes it irrational for Defendants to have filed their claims in arbitration rather than small claims court—*unless* the merit of any individual arbitration demand is irrelevant to the settlement strategy being pursued by counsel on behalf of the entire class.  Although Defendants' arbitration demands are formally individual, they thereby function as part of a concerted effort by de facto class counsel to threaten costs sufficient to force Intuit into a global settlement, without any actual individual arbitration.  "The 'function over form' principle" that courts have applied in other cases serves the same "important purpose" here to prevent "undesirable strategic behavior" that exploits "'questionable claims'" to extort large settlements.  *Smith*, 2011 WL 5924460, at *5, 7; *see Concepcion*, 563 U.S. at 350.

83.     Although Keller Lenkner is, of course, free to pursue any strategy it wishes consistent with ethical rules governing attorney-client relationships, Defendants as purported users of TurboTax have "EXPRESSLY AND KNOWINGLY" agreed that they would not participate in "ANY … REPRESENTATIVE PROCEEDING."  Terms of Service § 14.

84.     If Defendants' mass arbitrations are allowed to proceed in this manner, those proceedings will share none of the features—"lower costs, greater efficiency[,] and speed," *Concepcion*, 563 U.S. at 348 (quotation marks omitted)—that the parties bargained for, and expected, when they opted to have their disputes resolved in binding individual arbitration or small claims court.  Instead, they will have the paradigmatic (and least desirable) features of a de facto class action.

### COUNT I

**INTUIT'S INVOCATION OF RULE 9(B) REQUIRES DEFENDANTS' ARBITRATION CASES TO BE ADMINISTRATIVELY CLOSED IN ACCORDANCE WITH THE PARTIES' ARBITRATION AGREEMENTS**

85.     Intuit incorporates the allegations of the preceding paragraphs by reference.

23

86.     There is an "actual controversy relating to the legal rights and duties of the respective parties" under their arbitration agreements.  Cal. Civ. Proc. Code § 1060.

87.     Intuit and Defendants contractually agreed that individual arbitration would be conducted pursuant to the AAA Consumer Rules, including Rule 9, the "Small Claims Option," which permits either party to take the claim to small claims court.

88.     Under the Terms of Service and the plain text of AAA Consumer Rule 9(b), Intuit has a right to provide written notice that it wants Defendants' claims decided by a small claims court.  Intuit exercised that contractual right by service of written notice on Defendants' counsel and the AAA on February 10 and March 13, 2020, but the AAA has refused to "close the case[s]," as required by the Terms of Service and Rule 9(b).

89.     Intuit is entitled under the Terms of Service to request judicial relief against Defendants to enforce the Terms as written.  *See* Terms of Service § 14 ("Notwithstanding anything to the contrary, any party to the arbitration may at any time seek injunctions or other forms of equitable relief from any court of competent jurisdiction."); AAA Consumer Arb. R-37(d); *see also Comedy Club, Inc. v. Improv W. Assocs.*, 553 F.3d 1277, 1286 (9th Cir. 2009) (construing similar contractual provision to permit parties to "pursue equitable remedies in courts in aid of the arbitration"); *Zhenhua Logistics (Hong Kong) Co., Ltd. v. Metamining, Inc.*, 2013 WL 4777202, at *2 (N.D. Cal. Sept. 6, 2013) (judicial relief in aid of arbitration is appropriate where, "despite diligent attempts to exhaust arbitral remedies," arbitral tribunal refuses to issue relief on "ground[s] unrelated to the merits" of the underlying claims (quotation marks omitted)).

90.     Absent a declaration by this Court that Intuit is entitled to invoke Rule 9(b) to have Defendants' claims heard in small claims court, and to have the corresponding arbitrations administratively closed, Intuit will be deprived of its ability to exercise that core due process guarantee under the parties' consumer arbitration agreements.  And once Keller Lenkner has paid filing fees for its third wave of 34,754 demands, Intuit will imminently be required to pay over $10 million in additional filing fees even if it again elects to have the vast majority of those cases heard in small claims court before arbitrators are appointed—exactly as Rule 9(b) allows.  The AAA, by its own representation, will

"abide by" this Court's order "specifying the manner in which the underlying arbitrations should, or should not, proceed."

## COUNT II

### SB 707 IS PREEMPTED BY THE FEDERAL ARBITRATION ACT

91. Intuit incorporates the allegations of the preceding paragraphs by reference.

92. There is an "actual controversy relating to the legal rights and duties of the respective parties" under their arbitration agreements and SB 707. Cal. Civ. Proc. Code § 1060.

93. Under the Supremacy Clause of the U.S. Constitution, the laws of the United States, including the FAA, "shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the … Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. Section 2 of the FAA provides that arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The FAA therefore preempts state laws that "flout[]" its "command to place [arbitration] agreements on an equal footing with all other contracts." *Kindred*, 137 S. Ct. at 1429.

94. A state-law rule can be preempted by the FAA in either of two ways. First, a state-law rule is preempted if it disfavors arbitration by not "appl[ying] equally to arbitration and non-arbitration agreements." *Blair v. Rent-A-Center, Inc.*, 928 F.3d 819, 825 (9th Cir. 2019) (quotation marks omitted). Second, a state-law rule is preempted if it "stands as an obstacle to the accomplishment of the FAA's objectives." *Id.* (quotation marks and alteration omitted).

95. SB 707 is invalid because it "singles out arbitration agreements for disfavored treatment." *Kindred*, 137 S. Ct. at 1425. "[O]n its face," *id.* at 1426, SB 707 applies only to arbitration agreements, and it imposes on them a definition of "material breach" that is distinct from, and at odds with, generally applicable state contract law. "Normally the question of whether a breach of an obligation is a material breach, so as to excuse performance by the other party, is a question of fact." *Brown v. Grimes*, 192 Cal. App. 4th 265, 277 (2011). Under SB 707, "the drafting party is in material breach of the arbitration agreement, is in default of the arbitration, and waives its right to compel arbitration" if it fails to pay certain fees "within 30 days after the due date"—regardless of the amount unpaid or the reason for non-payment. Cal. Civ. Proc. Code § 1281.97(a). Moreover, the statute requires that a drafting party

25

continue to perform its obligations (the payment of fees) *even if* the non-drafting party materially breaches the arbitration agreement, whereas ordinarily one party's material breach would "discharge[] [the other party] from its duty to perform under the contract." *Brown*, 192 Cal. App. 4th at 277.

96.     SB 707 is also preempted because it stands as an obstacle to the accomplishment of the FAA's objectives. "[T]he FAA was designed to promote arbitration," *Concepcion*, 563 U.S. at 345, but SB 707 will deter companies from including pre-dispute arbitration provisions in consumer and employment agreements by singling out companies that do so for severe, one-sided penalties. SB 707 not only mandates "monetary sanction[s]" against drafting parties that fail to pay certain fees, but also permits additional evidentiary, case-terminating, and even contempt sanctions. Cal. Civ. Proc. Code § 1281.99.

97.     In addition, SB 707 stands as an obstacle to the FAA's "principal purpose" of "ensur[ing] that private arbitration agreements are enforced according to their terms." *Concepcio*n, 563 U.S. at 344 (quotation marks omitted). The Terms of Service already incorporate AAA rules regarding fee-shifting and the consequences of non-payment. *See* AAA Consumer Arb. R-44(c), 54. SB 707 purports to displace that contractual framework for arbitrating disputes under the AAA rules, impeding the enforcement of the arbitration agreement according to the parties' agreed-upon terms.

98.     Absent a declaration by this Court that SB 707 is preempted on its face and as applied to the Terms of Service, Intuit and other companies will be deterred from including arbitration provisions in their agreements with consumers, and Intuit will face the same no-win choice: pay millions of dollars in unlawful arbitration fees for claims it elected to have resolved in small claims court, or risk coercive sanctions under an invalid state law.

## COUNT III

### INTUIT CANNOT BE COMPELLED TO ARBITRATE DEFENDANTS' DE FACTO REPRESENTATIVE ACTION

99.     Intuit incorporates the allegations of the preceding paragraphs by reference.

100.    There is an "actual controversy relating to the legal rights and duties of the respective parties" under their arbitration agreements. Cal. Civ. Proc. Code § 1060.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

101.     Intuit and Defendants contractually agreed to resolve disputes in binding individual arbitration, except where Rule 9 permits resolution in small claims court.  Defendants expressly waived the right to participate in a class action or to litigate on a class-wide basis.

102.     In violation of the parties' agreements, Defendants have commenced a de facto representative action.  Although brought as ostensibly individual demands, Defendants' claims bear the traditional hallmarks of a representative action:  Defendants' demands and the tens of thousands of others Keller Lenkner has filed are identical in all material respects.  Each sets forth the same generic allegations of wrongdoing by Intuit.  Each has been filed by the same counsel purporting to act on behalf of all Defendants in its communications with Intuit and the AAA.  Here, as in a representative action, the resolution of Defendants' claims are thus, as a practical matter, tied to the global resolution of an entire class of similarly situated claims.  Keller Lenkner has acted as de facto class counsel and, as in a class action, has evidently controlled decisions for the entire class with little or no decision-making input from individual clients, executing a strategy that is designed solely to obtain class-wide rather than individualized relief.  And there is accordingly the same heightened risk of in terrorem settlement that characterizes traditional class actions—due to the additive effect of the sheer number of claims independent of their individual merits.

103.     Individual arbitration is intended to reduce the costs and burdens of dispute resolution.  But the mass arbitrations filed by Defendants, through their counsel, are designed solely to extract a large settlement from Intuit by applying maximum pressure though the aggregation of arbitration fees associated with thousands of claims, regardless of the claims' underlying merit.  *See Concepcion*, 563 U.S. at 350 ("class arbitration greatly increases risks to defendants" because, "[f]aced with even a small chance of a devastating loss, defendants will be pressured into settling questionable claims").

104.     Individual arbitration is intended to expedite dispute resolution.  Defendants' filing of thousands of identical demands simultaneously, however, ensures that individual claims for relief will not be heard for years, if ever.

105.     Intuit has not consented to *any* class or representative proceedings under the parties' arbitration agreements.  The mass arbitrations filed by counsel purporting to represent Defendants and thousands of other similarly situated individuals thus displace the "efficient, streamlined procedures" the

27

parties bargained for with a process that will involve substantial cost, inefficiency, and delay. *Concepcion*, 563 U.S. at 344.  Because the parties' agreements prohibit such de facto representative actions, neither the AAA nor a court may compel Intuit to arbitrate in this manner.  *See* Cal. Civ. Proc. Code § 1281.2; *see also* 9 U.S.C. § 4.

106.    This Court should accordingly declare that Intuit cannot be compelled to arbitrate Defendants' claims on a de facto representative basis, and that individuals who wish to bring claims must do so in accordance with the parties' agreements.

107.    In addition, the Court should enjoin Defendants' de facto representative action before the AAA.  *See* Cal. Civ. Proc. Code § 526(a).  Under California law, a court has authority to compel arbitration only "if it determines that an agreement to arbitrate the controversy exists." *Id.* § 1281.2; *see* 9 U.S.C. § 4 (providing authority to issue orders "directing that … arbitration proceed in the manner provided for in [the parties'] agreement").  Further proceedings before the AAA will violate the parties' agreement due to both the de facto representative nature of those proceedings and Defendants' refusal to adhere to Rule 9(b).  Although the AAA has likewise refused to apply Rule 9(b), "[t]he appropriate remedy for an administrative mistake by the AAA" is "for the wronged party to seek injunctive relief against the party initiating the arbitration in an appropriate court." *Int'l Med. Grp., Inc. v. Am. Arbitration Ass'n, Inc.*, 312 F.3d 833, 844 (7th Cir. 2002).  Indeed, the Terms of Service expressly permit Intuit to do just that.  *See* Terms of Service § 14 ("Notwithstanding anything to the contrary, any party to the arbitration may at any time seek injunctions or other forms of equitable relief from any court of competent jurisdiction.").

108.    Such an injunction is necessary to prevent further violations of Intuit's contractual rights. Absent injunctive relief, Intuit will suffer irreparable harm by being forced to pay millions of dollars in fees to proceed with a de facto representative arbitration to which Intuit never consented—or face the severe penalties imposed by an unconstitutional statute.

109.    By contrast, Defendants will suffer no cognizable harm by being held to the terms of their agreements, which provide for disputes to be resolved in binding individual arbitration or, when permissible, small claims court—not in any class or representative proceeding.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1

## PRAYER FOR RELIEF

2     For the reasons above, Intuit respectfully requests that the Court:

3     1.  Declare that Intuit's notice of election under AAA Consumer Arbitration Rule 9(b)
4         required Defendants' cases to be administratively closed;

5     2.  Declare that SB 707 is preempted by the FAA and may not be enforced against Intuit;

6     3.  Declare that Intuit cannot be compelled to arbitrate Defendants' claims on a de facto
          representative basis, and that individuals who wish to bring claims against Intuit must do
7         so in individualized arbitrations or, where appropriate, small claims court, in accordance
          with the Terms of Service;
8
9     4.  Enjoin Defendants from proceeding further with their de facto representative action
          before the AAA; and
10
11    5.  Grant such other relief as may be just and proper.

12    DATED:  June 12, 2020                    Respectfully submitted,

13

14                                             _Matthew Ross_ (signature)

15    Rodger R. Cole (SBN 178865)              Matthew Benedetto (SBN 252379)
      FENWICK & WEST LLP                       WILMER CUTLER PICKERING
16    Silicon Valley Center                        HALE AND DORR LLP
      801 California Street                     350 South Grand Ave. Suite 2100
17    Mountain View, CA 94041                   Los Angeles, CA 90071

18    Molly R. Melcher (SBN 272950)            Jonathan E. Paikin (*pro hac vice* to be submitted)
      FENWICK & WEST LLP                       David Gringer (*pro hac vice* to be submitted)
19    555 California Street, 12th Floor         Benjamin Chapin (*pro hac vice* to be submitted)
      San Francisco, CA 94104                   Kevin M. Lamb (*pro hac vice* to be submitted)
20                                             WILMER CUTLER PICKERING
                                                   HALE AND DORR LLP
21                                             1875 Pennsylvania Avenue NW
22                                             Washington, DC 20006

23                                             *Attorneys for Plaintiffs*

24

25

26

27

28

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF