Jonathan E. Paikin (*pro hac vice*)
David Gringer (*pro hac vice*)
Benjamin Chapin (*pro hac vice*)
Kevin M. Lamb (*pro hac vice*)
WILMER CUTLER PICKERING
    HALE AND DORR LLP
1875 Pennsylvania Avenue NW
Washington, DC 20006
Telephone:  (202) 663-6000
Facsimile:  (202) 663-6363
jonathan.paikin@wilmerhale.com
benjamin@chapin@wilmerhale.com
david.gringer@wilmerhale.com
kevin.lamb@wilmerhale.com

Matthew Benedetto (SBN 252379)
WILMER CUTLER PICKERING
    HALE AND DORR LLP
350 South Grand Ave. Suite 2100
Los Angeles, CA 90071
Telephone:  (213) 443-5300
Facsimile: (213) 443-5400
matthew.benedetto@wilmerhale.com

*Attorneys for Respondent Intuit Inc.*

COUNSEL CONTINUED ON FOLLOWING PAGE

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| AALIYAH JOLLY, et al.,<br><br>                    Petitioners,<br><br>    v.<br><br>INTUIT INC.,<br><br>               Respondent. | Case No. 3:20-cv-04728-CRB<br><br>**RESPONDENT INTUIT INC.'S OPPOSITION TO PETITIONERS' MOTION TO COMPEL ARBITRATION**<br><br>Hearing Date: September 4, 2020<br>Time: 10:00 AM<br>Judge: Hon. Charles R. Breyer |

1
2
3
4
5

Rodger R. Cole (SBN 178865)
FENWICK & WEST LLP
Silicon Valley Center
801 California Street
Mountain View, CA  94041
Telephone:  (650) 988-8500
Facsimile:  (640) 938-5200
rcole@fenwick.com

6
7
8
9
10

Molly R. Melcher (SBN 272950)
FENWICK & WEST LLP
555 California Street, 12th Floor
San Francisco, CA  94104
Telephone:  (415) 875-2300
Facsimile:  (415) 281-1350
mmelcher@fenwick.com

11

*Attorneys for Respondent Intuit Inc.*

12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ..................................................................................... iii

SUMMARY OF ARGUMENT .................................................................................. ix

BACKGROUND ........................................................................................................ 1

    A.    IRS Free File Program ........................................................................... 1

    B.    TurboTax Terms Of Service And AAA Rules ....................................... 2

    C.    AAA Proceedings ................................................................................. 4

        1.    Petitioners' mass-arbitration filings .......................................... 4

        2.    Intuit's election of small claims court ....................................... 5

        3.    Intuit's payment of fees under threat of state-law sanctions ................................................................................ 6

    D.    Intuit's State-Court Action ................................................................... 8

    E.    Petitioners' Amended Demands And Federal Petition To Compel Arbitration ..................................................................... 9

STANDARD OF REVIEW ...................................................................................... 10

ARGUMENT ........................................................................................................... 11

I.    INTUIT HAS NOT REFUSED TO ARBITRATE THE UNDERLYING DISPUTES ......................................................................................................... 11

II.    THERE IS NO FEDERAL JURISDICTION TO COMPEL ARBITRATION ......................................... 16

    A.    Petitioners Added Sherman Act Claims To Manufacture Federal Jurisdiction ............................................................................ 17

    B.    Petitioners' Sherman Act Claims Are Patently Frivolous ............................................................................................. 18

        1.    Petitioners' theory that Intuit deceived the government is facially incoherent ................................................ 18

        2.    Petitioners' theory of collective concealment is utterly implausible ................................................................. 20

III.    THE COURT SHOULD DECLINE TO EXERCISE JURISDICTION UNDER *COLORADO RIVER* .............................................................................. 22

IV.     NONE OF INTUIT'S STATE-COURT CLAIMS IS SUBJECT TO
        ARBITRATION ................................................................................................ 26

        A.     Intuit Has A Clear Right To Elect Small Claims Court
               Under Consumer Rule 9(b) ............................................................... 26

        B.     The Prohibition On De Facto Class Proceedings Is Not
               Subject To Arbitration ...................................................................... 32

        C.     Petitioners Effectively Concede That Intuit's
               Preemption Claim Is Not Arbitrable ................................................. 34

CONCLUSION .............................................................................................................. 35

1

# TABLE OF AUTHORITIES

Page(s)

CASES

*Allemeier v. Zyppah,*
    2018 WL 6038340 (C.D. Cal. Sept. 21, 2018) ............................................................ 14

*American Airlines, Inc. v. Mawhinney,*
    904 F.3d 1114 (9th Cir. 2018) .................................................................................... 16

*AT&T Mobility LLC v. Bernardi,*
    2011 WL 5079549 (N.D. Cal. Oct. 26, 2011) ............................................................ 33

*AT&T Mobility LLC v. Concepcion,*
    563 U.S. 333 (2011) ..................................................................................................... 9

*Atlantic Coast Line Railroad Co. v. Brotherhood of Locomotive Engineers,*
    398 U.S. 281 (1970) ................................................................................................... 25

*Avila v. Pappas,*
    591 F.3d 552 (7th Cir. 2010) ..................................................................................... 16

*Bell Atlantic Corp. v. Twombly,*
    550 U.S. 544 (2007) ................................................................................................... 20

*Bell v. Hood,*
    327 U.S. 678 (1946) ....................................................................................... 16, 17, 18

*Bennett v. Medtronic, Inc.,*
    285 F.3d 801 (9th Cir. 2002) ..................................................................................... 25

*Bourns, Inc. v. Raychem Corp.,*
    331 F.3d 704 (9th Cir. 2003) ..................................................................................... 19

*Bubar v. Ampco Foods, Inc.,*
    752 F.2d 445 (9th Cir. 1985) ..................................................................................... 19

*Byers v. Intuit Inc.,*
    600 F.3d 286 (3d Cir. 2010) ...................................................................................... 21

*Carrington Capital Management, LLC v. Spring Investment Service, Inc.,*
    347 F. App'x 628 (2d Cir. 2009) ............................................................................... 12

*CIGNA HealthCare of St. Louis, Inc. v. Kaiser,*
    181 F. Supp. 2d 914 (N.D. Ill. 2002) ........................................................................ 23

*Community State Bank v. Strong,*
    651 F.3d 1241 (11th Cir. 2011) ................................................................................. 16

*Colorado River Water Conservation District v. United States*,
  424 U.S. 800 (1976)....................................................................................xii, 22, 24

*DePuy Synthes Sales, Inc. v. OrthoLA, Inc.*,
  403 F. Supp. 3d 690 (S.D. Ind. 2019) .................................................... 10, 22, 23

*DePuy Synthes Sales, Inc. v. OrthoLA, Inc.*,
  953 F.3d 469 (7th Cir. 2020) ......................................................... 10, 23, 24, 25

*Dorhmann v. Intuit Inc.*,
  2020 WL 4601254 (9th Cir. Aug. 11, 2020)........................................ix, 14, 26

*Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*,
  365 U.S. 127 (1961) ................................................................................................ 19

*Epic Systems Corp. v. Lewis*,
  138 S. Ct. 1612 (2018) ............................................................................................. x

*Erum v. County of Kauai*,
  2008 WL 763231 (D. Haw. Mar. 20, 2008)...................................................... 17

*Gelow v. Central Pacific Mortgage Corp.*,
  560 F. Supp. 2d 972 (E.D. Cal. 2008)................................................................ 10

*In re German Automotive Manufacturers Antitrust Litig.*,
  2020 WL 1542373 (N.D. Cal. Mar. 31, 2020)............................................ 20, 21

*Hall Street Associates L.L.C. v. Mattel, Inc.*,
  552 U.S. 576 (2008)........................................................................................ 15, 16

*Hartford Accident & Indemnity Co. v. Equitas Reinsurance Ltd.*,
  200 F. Supp. 2d 102 (D. Conn. 2002) ............................................................... 11

*Hinckley v. Bechtel Corp.*,
  41 Cal. App. 3d 206 (1974) ................................................................................. 29

*Jacobs v. USA Track & Field*,
  374 F.3d 85 (2d Cir. 2004)............................................................................ 12, 15

*Jones v. General Motors Corp.*,
  640 F. Supp. 2d 1124 (D. Ariz. 2009) ............................................................... 14

*Jones v. St. Paul Travelers*,
  2006 WL 2792430 (N.D. Cal. Sept. 27, 2006) ................................................. 12

*Kim v. Colorall Technologies, Inc.*,
  2000 WL 1262667 (N.D. Cal. Aug. 18, 2000) ................................................. 12

*Kindred Nursing Centers Limited Partnership v. Clark*,
  137 S. Ct. 1421 (2017).............................................................................................. 8

*Laif X Sprl v. Axtel, S.A. de C.V.*,
310 F. Supp. 2d 578 (S.D.N.Y. 2004) ...................................................................... 13

*LAIF X SPRL v. Axtel, S.A. de C.V.*,
390 F.3d 194 (2d Cir. 2004) ....................................................... xi, 11, 13, 14, 15

*Lamps Plus, Inc. v. Varela*,
139 S. Ct. 1407 (2019) ................................................... x, xii, 8, 26, 33, 34

*Leegin Creative Leather Products, Inc. v. PSKS, Inc.*,
551 U.S. 877 (2007) ........................................................................................ 21

*Lesson v. Transamerica Disability Income Plan*,
671 F.3d 969 (9th Cir. 2012) ......................................................................... 16

*Lifescan, Inc. v. Premier Diabetic Services, Inc.*,
363 F.3d 1010 (9th Cir. 2004) ........................................................... 15, 16, 31

*Local Joint Exec. Bd. of Las Vegas, Bartenders Union Local 165 v. Exber, Inc.*,
994 F.2d 674 (9th Cir. 1993) ......................................................................... 12

*Mastrobuono v. Shearson Lehman Hutton, Inc.*,
514 U.S. 52 (1995) ................................................................................... 28, 30

*MedImmune, Inc. v. Genentech, Inc.*,
549 U.S. 118 (2007) ....................................................................................... 35

*Montanore Minerals Corp. v. Bakie*,
867 F.3d 1160 (9th Cir. 2017) ....................................................................... 24

*Morgan Stanley Dean Witter Reynolds, Inc. v. Gekas*,
309 F. Supp. 2d 652 (M.D. Pa. 2004) ............................................................ 22

*Morgan v. Clark County Credit Union*,
376 F. App'x 788 (9th Cir. 2010) ............................................................. 16, 18

*Moses H. Cone Memorial Hospital v. Mercury Construction Corp.*,
460 U.S. 1 (1983) ............................................................................... xi, 11, 14

*Nakash v. Marciano*,
882 F.2d 1411 (9th Cir. 1989) ....................................................................... 23

*NRDC v. Perry*,
940 F.3d 1072 (9th Cir. 2019) ....................................................................... 32

*Negrete v. Allianz Life Insurance Co. of North America*,
523 F.3d 1091 (9th Cir. 2008) ....................................................................... 25

*Octane Fitness, LLC v. ICON Health & Fitness, Inc.*,
572 U.S. 545 (2014) ....................................................................................... 19

*PaineWebber, Inc. v. Faragalli*,
    61 F.3d 1063 (3d Cir. 1995) ............................................................... 10, 11, 12

*Pellico v. Mork*,
    2014 WL 4948124 (N.D. Ill. Oct. 1, 2014) ................................................... 17

*Postmates Inc. v. 10,356 Individuals*,
    2020 WL 1908302 (C.D. Cal. Apr. 15, 2020) ............................................... 18

*R.R. Street & Co. v. Transport Insurance Co.*,
    656 F.3d 966 (9th Cir. 2011) ..................................................................... 22, 24

*RLI Insurance Co. v. Kansa Reinsurance Co.*,
    1991 WL 243425 (S.D.N.Y. Nov. 14, 1991) ............................................... 27, 28

*Segal v. Silberstein*,
    156 Cal. App. 4th 627 (2007) ........................................................................ 30

*Sonic-Calabasas A, Inc. v. Moreno*,
    57 Cal. 4th 1109 (2013) ................................................................................ 29

*Steel Co. v. Citizens for a Better Environment*,
    523 U.S. 83 (1998) .................................................................................... 18, 20

*Stockton Firefighters' Local 456 v. City of Stockton*,
    2010 WL 3825674 (E.D. Cal. Sept. 28, 2010) .............................................. 22

*Stolt-Nielsen S.A. v. AnimalFeeds International Corp.*,
    559 U.S. 662 (2010) .................................................................................. 33, 34

*THI of New Mexico at Las Cruces, LLC v. Fox*,
    727 F. Supp. 2d 1195 (D.N.M. 2010) ........................................................... 22

*Tooley v. Napolitano*,
    586 F.3d 1006 (D.C. Cir. 2009) .................................................................... 17

*Toyo Tire Holdings of Americas Inc. v. Continental Tire North America, Inc.*,
    609 F.3d 975 (9th Cir. 2010) ......................................................................... 13

*Vaden v. Discover Bank*,
    556 U.S. 49 (2009) ....................................................... xi, 10, 16, 17, 22, 24

*Volt Information Sciences, Inc. v. Board of Trustees of Leland Stanford Junior University*, 489 U.S. 468 (1989) ................... 10, 13, 14, 15, 26, 27, 32

*Williams v. Aztar Indiana Gaming Corp.*,
    351 F.3d 294 (7th Cir. 2003) ........................................................................ 17

INTUIT'S OPPOSITION TO PETITIONERS'
MOTION TO COMPEL ARBITRATION
    vi
    Case No. 3:20-cv-04728-CRB

**DOCKETED CASES**

*In re CenturyLink Sales Practices & Securities Litigation*,
No. 0:17-md-2795 (D. Minn.)............................................................4

*In re Daily Fantasy Sports Litigation*,
No. 1:16-md-02677 (D. Mass Nov. 11, 2019)..........................................30

*In re Intuit Free File Litigation*,
No. 3:19-cv-2546 (N.D. Cal.)...........................................................14

*Intuit Inc. v. 9,933 Individuals*,
No. 20STCV22761 (Cal. Super. Ct., L.A. Cty.)..................................*passim*

*Postmates Inc. v. 10,356 Individuals*,
No. 2:20-cv-2783 (C.D. Cal. Apr. 9, 2020) ..........................................18

**STATUTES**

9 U.S.C.
§ 3............................................................................................14
§ 4................................................................xi, 10, 11, 12, 14, 16

15 U.S.C.
§ 1............................................................................................20
§ 15b.........................................................................................19

28 U.S.C. § 2283............................................................................25

Arbitration Agreements—Enforcement,
2019 Cal. Legis. Serv. Ch. 870 (S.B. 707)............................................6

Cal. Civ. Code
§ 1638....................................................................................27, 30
§ 1641....................................................................................28, 30

Cal. Code Civ. Pro.
§ 1281.2.....................................................................................24
§ 1281.97.....................................................................................6
§ 1281.98.....................................................................................6
§ 1281.99.....................................................................................7

Consolidated Appropriations Act, 2016,
Pub. L. No. 114-133, 129 Stat. 2242 (2015) ........................................19

Consolidated Appropriations Act, 2019,
Pub. L. No. 116-6, 133 Stat. 13 (2019) ..............................................19

1

**OTHER AUTHORITIES**

2   11 *Williston on Contracts* § 31:5 (4th ed. 2020) ...................................................................... 29

3   17A Wright & Miller, *Federal Practice and Procedure* § 4222 (3d ed. 2020) ................................ 25

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**SUMMARY OF ARGUMENT**

The Motion to Compel Arbitration (Dkt. 3) should be denied, and the Petition to Compel (Dkt. 1) should be dismissed, because there is nothing to compel.  Petitioners' 5,428 arbitrations are all pending before the American Arbitration Association ("AAA").  And each is proceeding, because Intuit has not refused to arbitrate any of the claims brought.  Rather, while these mass arbitrations proceed, Intuit has sought in state court a declaration of its rights in those arbitrations—judicial relief expressly authorized by the parties' agreement, which provides that "[n]otwithstanding anything to the contrary, *any party to the arbitration* may at any time seek injunctions or other forms of equitable relief from any court of competent jurisdiction."  TurboTax Terms of Service ("TOS") § 14 (Dkt. 4-2) (emphasis added); *see Dohrmann v. Intuit Inc.*, 2020 WL 4601254, at *2 (9th Cir. Aug. 11, 2020) (construing TOS § 14 to permit "equitable relief in aid of arbitration").  The AAA itself invited such relief, advising the parties that it would "abide by any court order directed to the parties specifying the manner in which the underlying arbitrations should, or should not, proceed."  Dkt. 7-1 at D-35.  In the meantime, Intuit has paid every fee that has come due, including initial filing fees of over $1.6 million for Petitioners' cases alone.

The Petition not only multiplies the proceedings, but does so without providing a means to resolve all the issues presented, much less as to all the parties in the state court.  This action is but part of a larger effort by Petitioners to expedite the fees due to the AAA in order to coerce an *in terrorem* settlement that bears no relationship to the underlying liabilities.  The law firm representing Petitioners, Keller Lenkner LLC, claims to represent 125,000 individuals that it has solicited through online advertising and social media posts.  After filing 45,251 arbitrations, the firm has already had to withdraw thousands of demands because they were frivolous—including more than a thousand arbitrations for which Intuit had already paid hundreds of thousands of dollars in fees.  Keller Lenkner withdrew these demands only after Intuit informed opposing counsel that those arbitrations were brought on behalf of people who are not Intuit customers at all, paid Intuit nothing to file their federal and state taxes, or were ineligible to use the Free File product they claim that Intuit failed to disclose.  The firm nevertheless continues to assert tens of thousands of largely unvetted demands that will require Intuit to pay $3,200 in fees to administer each arbitration for claimants who spent on

1    average less than $100 to use TurboTax in a given year.  And under the terms of what appears to be

2    Keller Lenkner's standard retention agreement, the firm would keep at least $750 of any recovery.

3    The ultimatum is simple:  Pay Keller Lenkner a vast settlement that bears no resemblance to the

4    actual amounts at stake, or pay the AAA hundreds of millions of dollars in fees to defend baseless

5    claims.

6           The TurboTax Terms of Service, which incorporate the AAA's Consumer Arbitration Rules,

7    provide a clear safeguard against exorbitant fees for low dollar-value claims:  Under Rule 9(b), any

8    party to a consumer arbitration may choose to have qualifying claims decided in small claims court

9    instead of arbitration, so long as that election is made *before* an arbitrator is appointed.  This

10   unilateral right ensures that the "lower costs, greater efficiency and speed" realized through

11   traditional individual arbitration, *Lamps Plus, Inc. v. Varela*, 139 S. Ct. 1407, 1416 (2019), are not

12   corrupted by a scheme that "would take much time and effort, and introduce new risks and costs for

13   both sides," *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1623 (2018).  While Intuit did not elect small

14   claims court for hundreds of demands filed by Keller Lenkner, it did exercise that right with respect

15   to all 9,933 arbitrations at issue in Intuit's state-court action, including Petitioners' 5,428 cases.

16   Each of these claims can be promptly and efficiently resolved in small claims court or through

17   individualized settlements.  In an attempt to preserve the potential windfall it hopes will result from

18   its mass-arbitration tactics, Keller Lenkner has taken the position on all its clients' behalf that the

19   contract waived Intuit's right to elect small claims court or is at least ambiguous and therefore

20   presents an arbitrable dispute about the meaning of the contract.  Thus, in Petitioners' view, Intuit

21   must forfeit over $17 million in fees for their 5,428 cases so that arbitrators who should never have

22   been appointed may decide whether those unrecoverable fees were ever owed.

23          Intuit's state-court action seeks to avoid that absurd result and enforce unequivocal language

24   in the contract expressly incorporating the protections of the AAA rules, including Rule 9(b).  The

25   contract provides for such suits in equity by any "party to the arbitration" "[n]otwithstanding

26   anything to the contrary."  TOS § 14.  But instead of presenting the same arbitrability arguments

27   raised in the Petition to the state court hearing Intuit's case, Petitioners took three steps to try to

28   preserve their negotiating leverage by maximizing the procedural complexity and inefficiency of

these proceedings:  (1) they purported to amend their arbitration demands with the AAA to add implausible and incoherent Sherman Act claims (despite a stay by the AAA of those arbitrations); (2) within hours, they then filed the instant Petition, seeking to invoke this Court's federal-question jurisdiction; and (3) the next day, they moved to stay the state-court action in its entirety on the basis of the federal Petition—even though the Petition concerns a fraction of the state-court defendants and only some of the claims in that action.  These tactics, which clearly aim to disrupt and delay Intuit's state-court action, should not be rewarded.

The Motion should be denied for four independent reasons:

*First*, Intuit has not in any way refused to arbitrate.  As a result, Petitioners are missing an "indispensable element" of their cause of action under the Federal Arbitration Act ("FAA").  *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 21 (1983).  Intuit has complied with the AAA's orders; it has paid all fees that have come due; and the AAA continues to administer each arbitration.  Intuit did exercise its right to elect small claims court for each of these arbitrations—a right provided to any party to a consumer arbitration by the AAA rules incorporated into the contract.  And in light of the AAA's refusal to adhere to those rules, Intuit has now sought a declaratory judgment in state court to enforce that contractual right, again pursuant to express language in the parties' agreement providing for such relief in aid of arbitration.  But none of that alters the fact that the arbitrations are moving forward, and that Intuit is cooperating fully in the arbitral process.  Petitioners therefore are not "aggrieved" by any refusal to arbitrate.  9 U.S.C. § 4; *see, e.g.*, *LAIF X SPRL v. Axtel, S.A. de C.V.*, 390 F.3d 194, 196 (2d Cir. 2004).

*Second*, this Court lacks federal jurisdiction to compel arbitration under the FAA.  Petitioners' have invoked this Court's jurisdiction based on two Sherman Act claims added to their arbitration demands hours before they filed the Petition.  The FAA "instructs federal courts to determine whether they would have jurisdiction over 'a suit arising out of *the* controversy between the parties'; it does not give … petitioners license to recharacterize an existing controversy, or manufacture a new controversy, in an effort to obtain a federal court's aid in compelling arbitration."  *Vaden v. Discover Bank*, 556 U.S. 49, 68 (2009) (emphasis in original).  Petitioners' eleventh-hour addition of Sherman Act claims—which are wholly implausible and in fact squarely foreclosed by

Supreme Court precedent—appears to have been designed solely to manufacture federal jurisdiction. That is impermissible.

**Third**, even if the Court had jurisdiction, it should decline to exercise that jurisdiction in deference to Intuit's state-court action, based on the factors set forth in *Colorado River Water Conservation District v. United States*, 424 U.S. 800 (1976). The state-court action was filed first and is far more comprehensive. It offers Petitioners the same opportunity to raise their arbitrability arguments, but it is the only forum in which the issues in the Petition, as well as Intuit's own claims for relief, can all be decided at once as to all of the parties. By contrast, resolving the Petition will necessarily result in piecemeal litigation and rewards the transparent ploy by Petitioners to multiply the proceedings and interfere with, rather than participate in, a pending state-court case regarding the parties' rights with respect to the arbitrations.

**Fourth**, Intuit's state-court action asserts three claims: (1) the AAA was required to close Petitioners' cases after Intuit elected to have them resolved in small claims court; (2) California's recently enacted law imposing one-sided penalties on companies with consumer arbitration agreements is preempted by federal law; and (3) Intuit cannot be compelled to arbitrate on a de facto representative basis. Petitioners seek to compel arbitration only with respect to the first and third claims. But neither of those claims is subject to arbitration. The contract is clear that Intuit may elect small claims court before arbitrators are appointed, and the AAA must close the arbitrations upon notice of that election. Petitioners' contrary arguments are meritless and seek to rewrite the contract to require Intuit to pay millions of dollars in fees to compensate 5,428 arbitrators to separately determine whether they should have been appointed in the first place. That would render the right at issue a nullity. Likewise, the contract contains a clear class-action waiver, so Intuit cannot be subject to an order compelling de facto class arbitration. As the Supreme Court has made clear, "[n]either silence nor ambiguity provides a sufficient basis for" imposing class arbitration that would "undermine the central benefits of arbitration itself." *Lamps Plus*, 139 S. Ct. at 1417.

The Court should deny Petitioners' Motion and dismiss the Petition.

# BACKGROUND

## A.  IRS Free File Program

Last year, more than 13 million taxpayers filed their taxes for free using Intuit's TurboTax software.  Decl. of Jack Rubin ("Rubin Decl.") ¶ 2.  Most did so using Intuit's free commercial product, TurboTax Free Edition.  *Id*.  As prominently disclosed on the TurboTax website, that product is available to the nearly 50 million taxpayers with "simple returns," *i.e.*, returns filed on Form 1040 with no attached schedules.  Decl. of Rodger R. Cole ("Cole Decl.") Ex. 1.  Over one million others filed free returns using a version of TurboTax that Intuit donates to the IRS Free File program, a voluntary public-private partnership formed in 2002 between the IRS and a consortium of tax-preparation companies (known as the Free File Alliance) to provide low- and middle-income taxpayers with free government-sponsored online tax-preparation options.  Rubin Decl. ¶ 2.  Under the terms of the Free File program, participating companies must make their Free File offering available to at least 10 percent, but no more than 50 percent, of income-eligible taxpayers.  Cole Decl. Ex. 4 § 4.1.3.

Although the IRS bears sole responsibility for administering and promoting the Free File program, Intuit has found itself defending against numerous lawsuits, investigations, and arbitrations following posts by ProPublica claiming that online tax-preparation companies "would rather [consumers] didn't know" about the IRS Free File program.  Cole Decl. Ex. 10 at 1.  ProPublica claimed that Intuit's commercial website should have directed Free File-eligible taxpayers to the IRS program and that Intuit instead "deliberately hid[]" its Free File offer when it deindexed from online search engines the TurboTax Free File program landing page during the 2018 tax season.  *Id.* at 11.  But while that allegation still appears prominently in Petitioners' arbitration demands, ProPublica issued a correction acknowledging Intuit's efforts to *promote* the software it donated to the program.  *Id.* Ex. 11 at 4.  For example, during the 2018 tax season, Intuit invested $1.5 million in its Tax Time Allies campaign to promote no-cost tax filing broadly, including the Free File program, *id*. Ex. 12 at 3, which resulted in more than 700,000 taxpayers clicking on ads that directed them to the IRS's Free File homepage, *id*. Ex. 13 at 1.  And as in years past, Intuit sent at least *seven* email reminders (far exceeding the one required by the IRS) to former Free File customers to invite them once again

to use Intuit's Free File product.  Rubin Decl. ¶ 3.  Approximately 230,000 taxpayers clicked on those email reminders, which linked directly to the landing page for Intuit's Free File service.  *Id*. And Intuit's efforts had concrete results:  Approximately 1.2 million Americans filed their 2018 taxes using the TurboTax Free File product, *id*. ¶ 2, accounting for more than 40 percent of all Free File use, *see* Cole Decl. Ex. 15 at 3.  And despite having no obligation to do so, Intuit discloses its Free File offering on its commercial website, explaining the eligibility criteria and the differences between that service and TurboTax Free Edition, and directing interested customers to the TurboTax Free File product page.  *Id*. Ex. 14.

Petitioners nevertheless allege that Intuit, in marketing its commercial products on its commercial website, failed to disclose the Free File program, or otherwise failed to market it as robustly as Intuit's commercial products.  Both the premise that Intuit must refer to its Free File offering in marketing its commercial products, and the allegations that Intuit made the program inaccessible to consumers, have been refuted by an independent investigation commissioned by the IRS.  Cole Decl. Exs. 15-16.  As the report from that investigation explains, the Free File program is a "partnership," which "requires a balance that serves the interests of the government and taxpayers, *but also creates a value to the for-profit industry that provides the service*."  *Id*. Ex. 15 at 58 (emphasis added).  Since the Free File program began in 2002, participating companies have thus always had "the right … to engage in any business activity outside" the program in the "same manner" as if they did not participate in the program at all.  *Id*. Ex. 5 § VIII.  That right includes "without limitation all marketing, advertising or promotion of commercial tax preparation software or services offered at no cost or for a fee."  *Id*.  And participants have no "marketing or other [promotional] obligation with regard to the IRS Free File Program."  *Id.*

## B.  TurboTax Terms Of Service And AAA Rules

Users of TurboTax agree to Terms of Service that require disputes to be resolved in individual arbitration or small claims court.  TOS § 14.  In particular, the Terms provide for arbitration of consumer disputes to be "conducted by the [AAA] … under the AAA's rules," which give "either party" the "cho[ice]" to elect small claims court for claims "within [that court's]

jurisdiction."  AAA R-9.[1]  Under the AAA's Due Process Protocol, "access to small claims court" is one of the "minimum due process standards" for a "fundamentally-fair ADR process" in the consumer context.  AAA Due Process Princ. 1 cmt.  The AAA Rules and Due Process Protocol thus confer on "all parties" to a consumer dispute "the right to seek relief in a small claims court" for qualifying claims.  *Id*. Princ. 5.  As the AAA explains, small claims court is "the least expensive and most efficient alternative" for resolving "claims for minor amounts," and such courts "typically provide a convenient, less formal and relatively expeditious judicial forum" with "the benefit, where necessary, of the coercive powers of the judicial system."  *Id.* Princ. 5 cmt.

The AAA's Consumer Rule 9 provides two ways parties may unilaterally direct qualifying claims to small claims court *before* any arbitrator is appointed:  (1) a party can file directly in small claims court in lieu of demanding arbitration under Rule 9(a), or (2) if the case was first filed with the AAA, but no arbitrator has been appointed, "a party can send a written notice" under Rule 9(b) "that it wants the case decided by a small claims court," and "the AAA will administratively close the case."  If a party wishes to go to small claims court "*[a]fter* the arbitrator is appointed," however, the case is not automatically closed; rather, "it is up to the arbitrator to determine if the case should be decided in arbitration or … in small claims court."  AAA R-9(c) (emphasis added).

The AAA directs companies to give consumers "clear and adequate notice of the arbitration provision" as well as "notice of the option to make use of applicable small claims court procedures as an alternative."  AAA Due Process Princ. 11.  Consistent with that directive, the Terms of Service state at the outset of § 14 that:  "ANY DISPUTE OR CLAIM RELATING IN ANY WAY TO THE SERVICES OR THIS AGREEMENT WILL BE RESOLVED BY BINDING ARBITRATION, RATHER THAN IN COURT, except that you may assert claims in small claims court if your claims qualify."  That notice, however, does not reference—let alone waive—any right by Intuit.  By contrast, where the Terms waive a right, such as the right to participate "AS A PLAINTIFF OR

---

[1] For the Court's convenience, the AAA Consumer Arbitration Rules, Consumer Due Process Protocol, and Consumer Arbitration Fact Sheet are attached, respectively, as Exhibits 19, 20, and 21 to the Cole Declaration.

CLASS MEMBER IN ANY PURPORTED CLASS OR REPRESENTATIVE PROCEEDING," they indicate that the party has waived that right "EXPRESSLY AND KNOWINGLY." TOS § 14.

The Terms of Service further provide that "[p]ayment of all filing, administration and arbitrator fees and costs will be governed by the AAA's rules, but if you are unable to pay any of them, Intuit will pay them for you." TOS § 14.  The Terms do not refer to any other variation from the AAA rules.  Under the AAA's fee schedule, consumers pay $200 to file a demand with the AAA absent a fee waiver, while Intuit pays a $300 filing fee, an additional $1,400 case management fee, and a minimum of $1,500 in arbitrator compensation.  AAA R-4, 5, Costs of Arbitration.

In addition to providing parties the failsafe of small claims court for qualifying claims, the Terms give "any party to the arbitration" the right to "seek … equitable relief from any court of competent jurisdiction." TOS § 14.

### C.  AAA Proceedings

#### 1.  Petitioners' mass-arbitration filings

Petitioners are among tens of thousands of individuals whom Keller Lenkner LLC represents in waves of mass arbitrations filed against Intuit with the AAA.  The firm's business model is clear: It solicits clients through online advertising and social-media posts, conducting minimal (if any) diligence on the merits of any given client's claim.  Pursuant to what appears to be its standard engagement letter, the firm keeps a minimum of $750 of any recovery.[2]  After amassing a large list of clients, it approaches the company and threatens to file thousands of arbitration demands at once—thereby triggering thousands of dollars in fees the company is responsible for paying the AAA to administer each arbitration, regardless of the merits.  Keller Lenkner then makes clear that a massive settlement, well in excess of any potential liability associated with the substantive claims, is the only way to avoid those fees.

Keller Lenkner has followed that playbook here.  In October 2019, it filed a thousand arbitration demands against Intuit.  It then contacted Intuit, claiming to represent 42,000 claimants

---

[2]  One of Keller Lenkner's engagement letters was publicly filed in a case involving mass arbitrations against a different company.  *See* Decl. of Andrew M. Unthank ¶ 26, *In re CenturyLink Sales Practices & Secs. Litig.*, No. 0:17-md-2795 (D. Minn. Jan. 10, 2020) (Dkt. 512).

1    and proposing mediation to reach a global settlement.  In preparation for that mediation, Intuit

2    conducted an analysis—which it shared with opposing counsel—finding that the vast majority of

3    these claims were frivolous.  Cole Decl. ¶ 19.  Within days of receiving that analysis, Keller Lenkner

4    withdrew from the mediation and filed a second wave of 9,497 new demands against Intuit.  *Id*. ¶ 20.

5    Each of the 10,497 demands in these first two waves contained identical boilerplate allegations that

6    Intuit "channeled" consumers eligible for its Free File offering "into its paid products by offering

7    those products … while omitting any reference on its website to the Free File program."  *Id*. Ex. 18.

8    Each demand likewise asserted that Intuit's conduct "constitutes fraud and unjust enrichment at

9    common law" and violates the consumer-protection law of the claimant's home state.  *Id*.  On March

10   10, 2020, Keller Lenkner submitted a third wave of 34,754 generic individual demands, but it did not

11   submit initial filing fees for those demands—which were therefore not "considered properly filed,"

12   AAA R-2—until recently.  *See infra* p. 10 n.4.

13                  **2.  Intuit's election of small claims court**

14          On February 10 and March 13, 2020, Intuit exercised its contractual right to have 9,933 of

15   the 10,497 cases, including Petitioners' 5,428 cases, decided in small claims court by serving written

16   notices of election under Rule 9(b).  Cole Decl. ¶ 21.  Intuit then paid filing fees for the remaining

17   564 cases proceeding in arbitration.  *Id*.  The AAA, however, did not "administratively close" the

18   9,933 cases, as Rule 9(b) mandates.  Instead, it invited a response by Keller Lenkner, which objected

19   on behalf of each and every one of its clients at the same time.  Dkt. 7-1 at D-5.  Keller Lenkner did

20   not dispute what Rule 9(b) requires, instead arguing that the Terms of Service "prohibited" Intuit

21   from making "such an election" by notifying consumers of *their* right to take claims to small claims

22   court without mentioning Intuit's parallel right to do so under Rule 9(b).  *Id*.  Alternatively, Keller

23   Lenkner argued, this dispute raised an issue for the arbitrator.  *Id*.

24          In multiple letters to the AAA, Intuit explained the defects of that position.  Dkt. 7-1 at D-8-

25   13, 19-23, 26-28.  *First*, the language at issue—"ANY DISPUTE … WILL BE RESOLVED BY

26   BINDING ARBITRATION, RATHER THAN IN COURT, except that you may assert claims in

27   small claims court if your claims qualify"—is clearly not intended to waive any party's rights under

28   the AAA rules, but merely to notify consumers of their right to take claims to small claims court in

1   lieu of arbitration, as directed by the AAA's own Due Process Protocol.  *Second*, if Keller Lenkner's

2   interpretation were correct, the Terms of Service would violate the Due Process Protocol, requiring

3   the AAA to decline to administer the cases altogether.  *Third*, the application of Rule 9(b) cannot be

4   an issue of arbitrability because, by its terms, it applies "before the arbitrator is formally appointed"

5   and mandates that the AAA "administratively close the case[s]."  By contrast, removal to small

6   claims court "[a]fter the arbitrator is appointed" is governed by Rule 9(c), which leaves "it … up to

7   the arbitrator to determine if the case should be decided in arbitration or …  in small claims court."

8          Without addressing Intuit's arguments, the AAA declined to close the 9,933 cases,

9   concluding that "the issues presented are arbitrability disputes that must be resolved by an

10  arbitrator(s)."  Dkt. 7-1 at D-17-18, 29-30, 35-36.  The AAA advised that the contract "complies

11  with the due process standards," and it would therefore "proceed with the administration of each

12  individual case under the Consumer Rules," appointing individual arbitrators to decide the Rule 9(b)

13  issue thousands of times over.  Dkt. 7-1 at D-35.  The AAA stated, however, that it would "abide by

14  any court order directed to the parties specifying the manner in which the underlying arbitrations

15  should, or should not, proceed."  *Id*.

16                    **3.  Intuit's payment of fees under threat of state-law sanctions**

17         At Keller Lenkner's urging, Dkt. 7-1 at D-7, the AAA notified Intuit that the initial fees for

18  the 9,933 arbitrations would need to be paid by April 19, under California Senate Bill 707 ("SB

19  707"), *id*. at D-17.  That law, which was enacted after the parties executed the arbitration agreements

20  here, targets companies that use such agreements by imposing draconian, one-sided sanctions for

21  late payment of arbitration fees.  *See* 2019 Cal. Legis. Serv. Ch. 870.  Under SB 707, a "drafting

22  party" that fails to pay its fees within thirty days of the due date set by the arbitration administrator is

23  deemed "in material breach of the arbitration agreement, is in default of the arbitration, and waives

24  its right to compel arbitration," regardless of the circumstances or reasons for late payment.  Cal.

25  Code Civ. Proc. § 1281.97(a); *see also id.* § 1281.98(a).  Such "breach" gives rise to a variety of

26

27

28

1    judicial sanctions, including mandatory monetary sanctions, as well as potential evidentiary, case-

2    terminating, and even contempt sanctions.  *Id*. § 1281.99.[3]

3         On April 17, having exhausted all recourse through the AAA, and to avoid SB 707's

4    sanctions, Intuit paid roughly $3 million under protest to arbitrate the 9,933 cases for which it

5    elected small claims court.  Cole Decl. ¶ 25.  The AAA originally indicated that it could open about

6    50 cases per week—a rate at which it would take *over two years* just to open Petitioners' 5,428

7    cases.  *Id*. ¶ 26.  On May 27, however, without providing any reasonable assurances that cases would

8    in fact be decided more quickly, the AAA notified the parties it would initiate all 10,497 cases

9    currently pending over six weeks starting the week of June 1—with 100 cases in the initial wave,

10   followed by waves of 900, 1,500, 2,000, 2,500, and 3,467 cases—thereby triggering over $28.8

11   million in additional fees Intuit must pay before arbitrators can be appointed, to avoid SB 707's

12   sanctions for cases that should have been closed.  *Id*.

13        By refusing to abide by the plain terms of its own administrative rules, the AAA has set Intuit

14   on a path to pay hundreds of millions of dollars in fees to the AAA to initiate arbitrations for

15   everyone Keller Lenkner claims to represent—even though small claims court offers all the same

16   relief in an indisputably less costly and more efficient forum for resolving the merits of individual

17   cases involving software that cost Petitioners less than $100 on average to use (and, in many cases,

18   nothing at all).  Indeed, although Intuit informed Keller Lenkner that the vast majority of claims

19   were frivolous—for example, because the claimant paid Intuit nothing to file their federal and state

20   taxes—Keller Lenkner refused to withdraw the demands before those fees came due.  Now that the

21   fees have already been paid, Keller Lenkner has belatedly withdrawn over one tenth of the initial

22   10,497 cases it filed.  *See infra* p. 10 n.4.

23

24

25

26

---

27        [3]  The AAA determined that SB 707's statutory deadlines and penalties apply to all claimants
     under the contract—regardless of residence—yet declined to decide whether Rule 9(b) applies to
28   those same claimants' arbitrations under the same contract.  Dkt. 7-1 at D-17.

**D.  Intuit's State-Court Action**

On June 12, Intuit filed suit in Los Angeles Superior Court seeking "equitable relief" as a "party to the arbitration" to enforce its contractual rights.  TOS § 14; *see* Dkt. 4-5 (Compl., *Intuit Inc. v. 9,933 Individuals*, No. 20STCV22761).  That action asserts three claims for relief.

*First*, Intuit asserts its right to elect small claims court for qualifying claims *before* arbitrators are appointed—consistent with the AAA rules incorporated into contract and the Due Process Protocol, which give that right to every party to a consumer arbitration administered by the AAA. Compl. ¶¶ 22-33, 56-73, 85-90.  Accordingly, Intuit seeks a judicial declaration that the AAA was required to administratively close the 9,933 cases in which Intuit made such an election, in accordance with the plain terms of the parties' agreement, so that those claims can be heard in small claims court.  *Id*.

*Second*, Intuit seeks a judicial declaration that SB 707 is preempted by the FAA and thus cannot be enforced against Intuit.  Compl. ¶¶ 34-43, 91-98.  Under the threat of SB 707's penalties, Intuit has already paid millions of dollars and faces millions more in fees for cases that should have been closed.  *Id.* ¶¶ 40, 69-70, 72.  As Intuit's complaint explains, SB 707 displaces generally applicable state contract law regarding what constitutes a material breach, and the remedies for breach, with an arbitration-specific regime that heaps harsh and asymmetric penalties on companies that include arbitration provisions in consumer contracts.  *Id.* ¶ 34-43, 91-98.  By singling out arbitration agreements for discriminatory treatment, SB 707 "flout[s] the FAA's command to place those agreements on an equal footing with all other contracts," *Kindred Nursing Centers Ltd. P'ship v. Clark*, 137 S. Ct. 1421, 1429 (2017), and erects a substantial obstacle to accomplishing the FAA's purpose of ensuring that arbitration agreements are enforced according to their terms, *see Lamps Plus, Inc. v. Varela*, 139 S. Ct. 1407, 1415 (2019).

*Third*, Intuit seeks a declaration that it cannot be compelled to arbitrate Defendants' claims on a de facto representative basis and that individuals who wish to bring claims must do so in individualized arbitrations or small claims court, in accordance with the Terms of Service.  *See* Compl. ¶¶ 47-55, 74-84, 99-109.  Although ostensibly brought individually, these mass arbitrations bear all the hallmarks of a class action:  They are identical in all material respects; each asserts the

8

same generic allegations of wrongdoing; and each has been filed by counsel purporting to act on all claimants' behalf simultaneously—indeed, Keller Lenkner has acted as de facto class counsel with little or no evident input from individual clients, executing a strategy designed entirely to obtain class-wide rather than individualized relief. *Id.* The only difference is that in a class action, interim class counsel is appointed by the Court to represent the interests of the class and fee awards are generally limited to no more than 33 percent of any recovery. But, here, the same collective form of representation is occurring, without any of those procedural safeguards. And the same additive effect of the sheer number of claims, independent of their individual merits, results in the same heightened risk of *in terrorem* settlement typical of traditional class actions. *See AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 350 (2011). These mass arbitrations thus displace the "efficient, streamlined procedures" the parties bargained for with a process, never consented to, that will involve substantial cost, inefficiency, and delay. *Id.* at 344.

After Intuit filed its state-court action, the AAA stayed the 9,933 arbitrations until July 16 under Rule 1(f), which mandates a 30-day stay to permit "a party seek[ing] judicial intervention with respect to a pending arbitration … to obtain a stay of arbitration from the court." The parties have continued arbitrating the remaining cases before the AAA. On July 10, Intuit requested an additional stay from the AAA because the Superior Court had not yet assigned a judge in *9,933 Individuals*. Cole Decl. Ex. 23. The AAA invited a response from Keller Lenkner by July 16, the date on which the initial stay was set to expire. *Id.* Ex. 24. On July 20, the AAA extended its stay "due to the unusual circumstances caused by the global pandemic," stating that absent a "court order or party agreement staying" the cases, the AAA "will proceed with administration" on August 17. *Id.* Ex. 25. The AAA reiterated that it would "abide by any court order." *Id.*

### E. Petitioners' Amended Demands And Federal Petition To Compel Arbitration

On July 15, Keller Lenkner added federal antitrust violations to 10,494 pending arbitration demands, based on the same conduct it claims violated state fraud consumer protection laws. Cole Decl. ¶ 33. The same day, relying exclusively on the federal antitrust claims as a basis for federal jurisdiction, Keller Lenkner filed the instant Petition to Compel Arbitration (Dkt. 1) on behalf of 5,428 of the defendants in Intuit's state-court action. Pet. ¶ 14. The next day, Keller Lenkner moved

on behalf of all defendants in *9,933 Individuals* to stay that action "in its entirety" based on the Petition, which, on its face, pertains to less than 55% of the defendants there, and to only some of the issues presented.

The Petition asks this Court to compel Intuit to arbitrate two contractual entitlements pending before the Superior Court:  (1) Intuit's right to elect small claims court before appointment of arbitrators under rules explicitly incorporated into the Terms of Services and (2) Intuit's right not to be compelled to arbitrate on a de facto representative basis.  Pet. ¶ 33.  Petitioners do not argue that Intuit can or should be compelled to arbitrate its claim that SB 707 is preempted by the FAA.  *Id.* Rather, they argue—irrelevantly here—that Intuit's preemption claim is unripe.  *Id.*  Petitioners ask that the Court order Intuit to "arbitrate each Petitioner's underlying claims and Intuit's arguments about the sufficiency of Petitioners' arbitration demands and the availability of small claims court."  Proposed Order (Dkt. 3-1).  Petitioners nowhere acknowledge that Intuit already paid $1.6 million in fees for their arbitrations to proceed ($3 million, counting the other 4,505 at issue in the state-court action), that all of the arbitrations are pending, or that Intuit's lawsuit seeks "equitable relief" as a "*party to the arbitration*," as expressly permitted by the contract, TOS § 14 (emphasis added).[4]

## STANDARD OF REVIEW

A petition to compel may be granted only if "the other party 'unequivocally refuses to arbitrate, either by failing to comply with an arbitration demand or by otherwise unambiguously manifesting an intention not to arbitrate.'"  *Gelow v. Cent. Pac. Mortg. Corp.*, 560 F. Supp. 2d 972, 978 (E.D. Cal. 2008) (quoting *PaineWebber, Inc. v. Faragalli,* 61 F.3d 1063, 1066 (3d Cir. 1995)); *see also* 9 U.S.C. § 4.  In addition, "[t]he petition to compel must be supported by an independent basis for federal subject-matter jurisdiction."  *Gelow*, 560 F. Supp. 2d at 978.  Absent such a

---

[4]  After filing the Petition, Keller Lenkner paid initial filing fees for 31,054 of the 34,754 arbitration demands it filed almost five months earlier, withdrawing the remaining 3,700.  Cole Decl. ¶ 37.  The firm has also withdrawn 1,143 other demands, including for 1,047 defendants in the state-court action.  *Id*. ¶¶ 33, 38.  Intuit, however, had already paid $342,900 in non-refundable fees for those 1,143 claimants, and faced over $15 million in additional fees for the nearly 5,000 cases that Keller Lenkner has now withdrawn.  *Id*. ¶ 39.

1   jurisdictional basis, "the § 4 petition … must be dismissed." *Vaden v. Discover Bank*, 556 U.S. 49,

2   66 (2009).

3          Even where federal jurisdiction exists, a court may abstain from deciding a federal petition

4   that is duplicative of pending state court litigation raising the same issues.  *See, e.g.*, *DePuy Synthes*

5   *Sales, Inc. v. OrthoLA, Inc.*, 403 F. Supp. 3d 690, 704-12 (S.D. Ind. 2019) ("*DePuy I*"), *aff'd*, 953

6   F.3d 469, 477-79 (7th Cir. 2020) ("*DePuy II*").  And because arbitration "is a matter of consent, not

7   coercion, petitions that "would 'force the parties to arbitrate in a manner contrary to their

8   agreement'" must be denied.  *Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.*, 489

9   U.S. 468, 472, 479 (1989).

10                                         **ARGUMENT**

11  **I.    INTUIT HAS NOT REFUSED TO ARBITRATE THE UNDERLYING DISPUTES**

12         Only a "party aggrieved by the … refusal of another to arbitrate under a written agreement …

13  may petition" this Court to compel arbitration.  9 U.S.C. § 4.  "An indispensable element" of a

14  petition to compel arbitration is thus the respondent's "refusal to arbitrate."  *Moses H. Cone Mem'l*

15  *Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 21 (1983).  Where, as here, "there is no default" by the

16  respondent, the petition "shall be dismissed."  9 U.S.C. § 4.  The reason is clear:  The exclusive

17  relief authorized by the FAA is "an order summarily directing the parties to proceed with the

18  arbitration."  *Id.*  But that relief is pointless where a party "is currently submitting to arbitration,"

19  because it would merely compel the party "to do what it [is already] doing."  *LAIF X SPRL v. Axtel,*

20  *S.A. de C.V.*, 390 F.3d 194, 196 (2d Cir. 2004).  Without a refusal to arbitrate, "no dispute over

21  whether to arbitrate has arisen, and no harm has befallen the petitioner."  *PaineWebber*, 61 F.3d at

22  1067.  The petitioner is therefore not "'aggrieved' under the FAA," and the petition to compel

23  presents no "justiciable case or controversy."  *Id.*; *see Hartford Accident & Indem. Co. v. Equitas*

24  *Reinsurance Ltd.*, 200 F. Supp. 2d 102, 110 (D. Conn. 2002) (dismissing petition to compel for lack

25  of jurisdiction).

26         A "refusal to arbitrate" is accordingly a jurisdictional requirement of the Petition, and such a

27  refusal exists "only when the respondent unequivocally refuses to arbitrate, either by failing to

28  comply with an arbitration demand or by otherwise unambiguously manifesting an intention not to

arbitrate the subject matter of the dispute." *PaineWebber*, 61 F.3d at 1066; *see also Jones v. St. Paul Travelers*, 2006 WL 2792430, at *2 (N.D. Cal. Sept. 27, 2006) (citing standard under *PaineWebber*); *Kim v. Colorall Techs., Inc.*, 2000 WL 1262667, at *1 (N.D. Cal. Aug. 18, 2000) (same); *cf. Local Joint Exec. Bd. of Las Vegas, Bartenders Union Local 165 v. Exber, Inc.*, 994 F.2d 674, 676 (9th Cir. 1993) (holding analogous petition under Labor Management Relations Act requires an "unequivocal, express rejection" of an arbitration demand). Where, as here, the respondent has not "commenced litigation in lieu of arbitration" and has not "refused to abide by an order from an arbitrator," it "has not refused to arbitrate within the meaning of 9 U.S.C. § 4." *Carrington Capital Mgmt., LLC v. Spring Inv. Serv., Inc.*, 347 F. App'x 628, 631 (2d Cir. 2009).

Far from refusing to arbitrate, Intuit agrees that Petitioners' claims are subject to a valid arbitration agreement, and it has paid all filing fees that have become due, *including more than $1.6 million in initial fees for Petitioners' cases alone*. Intuit has also complied with every rule and order of the AAA. The conduct that Petitioners say shows a refusal to arbitrate is nothing more than Intuit's assertion of its own right *as a party to the arbitrations* to have them closed in accordance with the terms of the contract, which provides that either party may elect small claims court at any time before the arbitrator has been appointed under the incorporated AAA rules, *see* TOS § 14; AAA R-9. Seeking to bring arbitrations to a close so that the dispute may be heard in an alternative agreed-upon venue in accordance with the terms of the contract is not the "unequivocal refusal to arbitrate" that is a "prerequisite" to compelling arbitration under the FAA. *Kim*, 2000 WL 1262667, at *1. It is simply an effort to enforce the rights that the contract itself provides.

Nor is Intuit's filing of a declaratory-judgment action a refusal to arbitrate. As explained, the parties' agreement provides that "any party to the arbitration may at any time seek … equitable relief from any court of competent jurisdiction." TOS § 14. Intuit thus has not "commenced litigation *in lieu of arbitration*," *Carrington*, 347 F. App'x at 631 (emphasis added). Nor is Intuit seeking a declaration that the agreement is void or inapplicable. *See, e.g.*, *Jacobs v. USA Track & Field*, 374 F.3d 85, 89 (2d Cir. 2004). Intuit brought its state court action consistent with all AAA rules and the AAA's repeated assurances that it would comply with any court order regarding the issues presented in the state-court action. *See, e.g.*, Dkt. 7-1 at D-35; Cole Decl. Exs. 22, 25.

Parties to an arbitration may always seek judicial intervention where "necessary to preserve the meaningfulness of the arbitral process" itself, *Toyo Tire Holdings of Americas Inc. v. Cont'l Tire N. Am., Inc.*, 609 F.3d 975, 980 (9th Cir. 2010), including to vindicate their right *not* to arbitrate "in a manner contrary to their agreement," *Volt*, 489 U.S. at 472, 478-79.  As the Supreme Court explained in *Volt*, "the FAA does not confer a right to compel arbitration of any dispute at any time; it confers only the right to obtain an order directing that 'arbitration proceed *in the manner provided for in [the parties'] agreement*.'"  *Id*. at 474-75.  The Court thus upheld a state court's stay of arbitration in *Volt* because, in the circumstances there, "the parties' agreement did not require arbitration to proceed."  *Id*. at 475.  Intuit likewise seeks to prevent only arbitration that conflicts with the contract, *id*. at 472—relief that the Court approved in *Volt* and that the AAA has invited here.

Where pending litigation does not alter the fact that "the parties are currently arbitrating this dispute," a petition to compel is not a proper vehicle to block that litigation.  *LAIF X*, 390 F.3d at 196; *see also, e.g.*, *St. Paul Travelers*, 2006 WL 2792430, at *2 (denying petition to compel as "premature" where arbitration had "been initiated," and rejecting petitioner's argument that respondent's "filing of cross-claims" in court "constitute[d] a refusal to arbitrate").  In *LAIF X*, the petitioner, LAIF X, filed an arbitration demand against another shareholder, Telinor, alleging dilution of its ownership interest in a Mexican company.  *See* 390 F.3d at 196.  Telinor responded by filing suit in Mexico seeking a ruling that LAIF X "was not a shareholder of" the company.  *Id*.  Telinor then answered the arbitration demand and moved the AAA to stay the arbitration pending resolution of its lawsuit.  *Id.* at 198.  LAIF X filed a petition to compel, which the district court denied on the ground that Telinor was "already participating in the ongoing arbitration."  310 F. Supp. 2d 578, 581 (S.D.N.Y. 2004).

The Second Circuit affirmed, explaining that an order to arbitrate under the circumstances would amount to compelling Telinor "to do what it was doing."  *LAIF X*, 390 F.3d at 196.  Neither Telinor's decision to seek "a ruling of Mexican law from a Mexican court," nor its stay request to the AAA, changed the fact that Telinor had "submitted itself to the arbitral forum."  *Id*. at 200.  Telinor had "exercised its right in that forum to assert a procedural defense, and invoked the

1    discretion of the arbitral forum to stay proceedings in deference to the Mexican court on a point of

2    Mexican law." *Id.*  But that "conduct," the Second Circuit held, was not "an evasion of the arbitral

3    forum or an 'attempt to sidestep arbitration.'"  *Id.*

4         The grounds for denying the Petition in this case are even stronger.  Unlike Telinor's suit,

5    Intuit's declaratory-judgment action does not ask a court to decide any issue regarding the merits of

6    the parties' underlying disputes.  Rather, it seeks ancillary equitable relief regarding "*the manner*" in

7    which those disputes must be resolved under the parties' agreement.  *Volt*, 489 U.S. at 475.  The

8    dispositive fact remains that Intuit is participating in the arbitral process, seeking to have the

9    arbitrations resolved in a manner provided for by the parties' contract and the AAA rules.

10        Petitioners contend (at 11) that Intuit's filing of litigation necessarily constitutes a refusal to

11   arbitrate.  But none of their cases supports that sweeping proposition.  In *Moses H. Cone*, the refusal

12   to arbitrate took place when the respondent informed the petitioner over the phone that it would no

13   longer participate in arbitration.  *See* 460 U.S. at 6-7, 21.  That has not happened here.  In *Allemeier

14   v. Zyppah Inc.*, the refusal to arbitrate occurred when the respondent refused to pay the AAA filing

15   fees.  2018 WL 6038340, at *4 (C.D. Cal. Sept. 21, 2018).  Here, Intuit has paid all fees that have

16   come due.  And in *Jones v. General Motors Corp.* (which arose under § 3 of the FAA, not § 4), the

17   plaintiff "refused to arbitrate" by suing on his claims directly in federal court *in lieu of arbitration*,

18   and then opposing the defendants' motion to enforce the arbitration agreement.  640 F. Supp. 2d

19   1124, 1128, 1145-46 (D. Ariz. 2009).  Again, Intuit has done nothing of the sort.

20        *General Motors*, in fact, more closely resembles *In Re Intuit Free File Litigation*, No. 3:19-

21   cv-2546 (N.D. Cal.).  The plaintiffs there likewise filed their consumer-protection claims directly in

22   this Court *rather than* with the AAA or in small claims court, as the contract requires.  As this Court

23   no doubt recalls, Intuit moved to compel arbitration of those claims, seeking to enforce the Terms of

24   Service that the plaintiffs argued was unenforceable.  In now directing an order compelling

25   arbitration, the Ninth Circuit has distinguished the relief that the plaintiffs in that case sought—*i.e.*,

26   relief on the "merits" of their claims—from the type of "equitable relief in aid of arbitration" that

27   Intuit is seeking in its state-court action and that the contract explicitly "permits" "any party to the

28   arbitration" to pursue.  *Dohrmann v. Intuit Inc.*, 2020 WL 4601254, at *2 (9th Cir. August 11, 2020).

Here, the parties are proceeding in the first instance before the AAA rather than this Court based on a valid and enforceable agreement to arbitrate the merits of Petitioners' claims, and Intuit is seeking judicial relief in aid of those arbitrations on the same exact premise.  The state court action is thus "not directed at sidestepping arbitration," *LAIF X*, 390 F.3d at 200, but at enforcing the agreement "according to [its] terms," *Volt*, 489 U.S. at 479.

While Petitioners fault Intuit (Mot. 11-12) for asserting its rights as a "party to the arbitration[s]," TOS § 14, "exercis[ing] … right[s]" under the rules of the arbitral forum is clearly not "an evasion of the arbitral forum," *LAIF X*, 390 F.3d at 200; *see also, e.g.*, *Jacobs*, 374 F.3d at 89.  Nor has Intuit "breached" the contract (Mot. 11) by asking a court to interpret and enforce it.  Indeed, Petitioners purport to be doing the same thing here.  The contract provides that "*any party to the arbitration* may at any time seek" relief in aid of the arbitration, TOS § 14—a provision Petitioners completely ignore.

And as explained, the fact that the 9,933 arbitrations covered by Intuit's lawsuit have been stayed at Intuit's request as a result of the pending litigation is fully consistent with the AAA's administration of these arbitrations.  The initial 30-day stay was dictated by the AAA's rules, *see* AAA R-1(f), and a 30-day extension was granted by AAA in light of the impact of the global pandemic on court operations, *see* Cole Decl. Ex. 25.  The point of that temporary stay is precisely to permit Intuit to obtain the type of judicial relief in aid of arbitration that the contract expressly authorizes.

Finally, Petitioners assert (at 11-12) that Intuit's lawsuit seeks "to enjoin the arbitration altogether and force Petitioners to litigate their claims in court."  Again, what Intuit seeks is to enforce the arbitration agreement and the AAA rules it incorporates by reference, which allow either party to have qualifying claims resolved in small claims court.  To the extent Petitioners are trying to imply that this exercise of a contractual right (and effort to enforce the contract) is comparable to forcing parties to litigate arbitrable claims in a court of general jurisdiction, that is meritless.

In sum, "there was no 'failure, neglect, or refusal' by [Intuit] to arbitrate in this case." *Lifescan, Inc. v. Premier Diabetic Servs., Inc.*, 363 F.3d 1010, 1013 (9th Cir. 2004).  Intuit has complied with the arbitration process and is seeking closure of the arbitrations only in the precise

1   manner provided for by the contract and by the incorporated arbitration rules.  Even accepting

2   Petitioners' unfounded reading of the contract and the de facto class manner in which these mass

3   arbitrations are proceeding—issues that, in Intuit's view, contravene unequivocal contractual

4   protections, *see infra* pp. 26-34—the arbitrations have otherwise "proceeded pursuant to the parties'

5   agreement."  *Lifescan*, 363 F.3d at 1013.  "There [is] therefore no basis for … compelling

6   arbitration."  *Id*.

7   **II.   THERE IS NO FEDERAL JURISDICTION TO COMPEL ARBITRATION**

8           The FAA "bestow[s] no federal jurisdiction."  *Hall Street Assocs. L.L.C. v. Mattel, Inc.*, 552

9   U.S. 576, 582 (2008).  And it "does not give § 4 petitioners license to recharacterize an existing

10  controversy, or manufacture a new controversy, in an effort to obtain a federal court's aid in

11  compelling arbitration."  *Vaden*, 556 U.S. at 68.  Rather, in deciding a petition to compel arbitration

12  under the FAA, this Court must "'look through' the … petition" and determine that it "would have

13  jurisdiction" over "the substantive controversy between the parties," *but for* the agreement to

14  arbitrate.  *Id.* at 55, 70; *see* 9 U.S.C. § 4.  That "independent jurisdictional basis" is lacking in this

15  case.  *Vaden*, 556 U.S. at 59.

16          Here, Petitioners' sole basis for invoking this Court's jurisdiction is the addition of two

17  Sherman Act claims to their demands on the same day the Petition was filed—almost a year after

18  they filed their first wave of demands.  That pretextual pleading cannot withstand scrutiny.  To

19  establish federal-question jurisdiction, federal law must be "nonfrivolously invoked" as grounds for

20  the underlying dispute.  *Am. Airlines, Inc. v. Mawhinney*, 904 F.3d 1114, 1123 n.7 (9th Cir. 2018);

21  *see also Cmty. State Bank v. Strong*, 651 F.3d 1241, 1258 (11th Cir. 2011) (courts can "only

22  consider well-pled, non-frivolous" claims).  Such jurisdiction is lacking when the supposed federal

23  question either (1) "appears to be immaterial and made solely for the purpose of obtaining

24  jurisdiction" or (2) "is wholly insubstantial and frivolous."  *Lesson v. Transamerica Disability

25  Income Plan*, 671 F.3d 969, 975 (9th Cir. 2012) (quoting *Bell v. Hood*, 327 U.S. 678, 682-83

26  (1946)); *see also, e.g., Morgan v. Clark Cty. Credit Union*, 376 F. App'x 788, 789 (9th Cir. 2010)

27  (affirming dismissal under this standard); *Avila v. Pappas*, 591 F.3d 552, 553 (7th Cir. 2010) (same);

28

*Tooley v. Napolitano*, 586 F.3d 1006, 1009-10 (D.C. Cir. 2009) (same).  Petitioners' Sherman Act claims fail on each of those grounds.

### A.  Petitioners Added Sherman Act Claims To Manufacture Federal Jurisdiction

Petitioners' addition of Sherman Act claims was transparently "for the purpose of obtaining jurisdiction," *Bell*, 327 U.S. at 682.  Since October of last year, Keller Lenkner has filed thousands of substantively identical arbitration demands alleging exclusively state-law claims of deception.  Not once has Keller Lenkner raised a potential antitrust violation in connection with any of these arbitrations, including in any of the dozens of email or phone exchanges with Intuit's counsel.  Cole Decl. ¶ 34.  It was only on the day the Petition was filed that Petitioners amended their demands, which had been pending for months.  Keller Lenkner then promptly moved to stay the state court action based on the federal Petition, even though the Petition concerns only slightly more than half of the 9,933 arbitrations at issue in the state court action.  The amendment thus serves a single obvious purpose:  to invest this Court with jurisdiction.  But the Supreme Court has made clear that parties may not "recharacterize an existing controversy, or manufacture a new controversy" simply to obtain federal jurisdiction.  *Vaden*, 556 U.S. at 68.

"The text of [the FAA] instructs federal courts to determine whether they would have jurisdiction over 'a suit arising out of *the* controversy between the parties.'"  *Vaden*, 556 U.S. at 68 (emphasis in original).  For nearly a year, the controversy here has been a purely state-law matter.  Keller Lenkner's attempt at "bootstrapping" Sherman Act theories onto state-law deception claims is "so transparent an attempt to move a state-law dispute to federal court … that it does not arise under federal law at all."  *Williams v. Aztar Indiana Gaming Corp.*, 351 F.3d 294, 299-300 (7th Cir. 2003) (omission in original); *see also, e.g.*, *Erum v. Cty. of Kauai*, No. 08-00113 SOM-BMK, 2008 WL 763231, at *1-8 (D. Haw. Mar. 20, 2008) (dismissing amended complaint for lack of jurisdiction where federal claims were based on factual allegations "identical" to those in previously dismissed original complaint and "history of [the] case" made clear that plaintiff's intent was to "manufacture subject matter jurisdiction"), *aff'd*, 369 F. App'x 843 (9th Cir. 2010); *Pellico v. Mork*, 2014 WL 4948124, at *5 (N.D. Ill. Oct. 1, 2014) ("plaintiff's motives for filing [a] federal action [were] questionable," given that federal complaint "alleged a single constitutional violation … based on the

exact same facts and allegations" in a parallel state court case, where plaintiff was free to seek relief).[5]

## B. Petitioners' Sherman Act Claims Are Patently Frivolous

Petitioners' eleventh-hour Sherman Act claims are also "wholly insubstantial and frivolous." *Bell*, 327 U.S. at 682-83.  Petitioners' two antitrust theories—which rely on the same purported scheme by Intuit to deceive customers about free tax-preparation software available through the IRS Free File program—are (1) that Intuit somehow also deceived *the IRS* about that agency's own Free File program and thereby "box[ed] out a significant potential competitor … from the market for online tax preparation and filing services," Dkt. 1-3 at 1, 6-7; and (2) that Free File Alliance members, including Intuit, "colluded to hide the Free File program and to steer the taxpayers into their respective paid products," *id.* at 7.  Each theory is "so insubstantial, implausible, foreclosed by prior decisions of [the Supreme] Court, or otherwise completely devoid of merit as not to involve a federal controversy." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998); *see also Morgan*, 376 F. App'x at 789 (affirming dismissal for lack of jurisdiction where plaintiff "pleaded only state law claims," and federal "claim was not colorable").

### 1. Petitioners' theory that Intuit deceived the government is facially incoherent

Petitioners first assert that Intuit deprived consumers "of a truly widely available free-file option" by "deceiv[ing] a formidable potential competitor, the United States government, from entering the market for online tax preparation and filing services." Dkt. 1-3 at 6-7.  They allege no facts to support that conclusory assertion, and it is not cognizable for at least three reasons.

---

[5] Notably, in separate mass arbitrations against Postmates, Keller Lenkner took the opposite position in seeking to defeat federal jurisdiction after Postmates sued for a declaratory judgment in federal court.  Keller Lenkner argued that *Vaden*'s "look through" approach to jurisdiction did not apply, and that the Fair Labor Standards Act claims at issue in the arbitrations therefore could not support federal jurisdiction because Postmates' action involved a "purely" state-law dispute over the meaning of an arbitration agreement "governed by state contract law."  Defs. TRO Opp. 19-20, *Postmates Inc. v. 10,356 Individuals*, No. 2:20-cv-2783 (C.D. Cal. Apr. 9, 2020) (Dkt. 21).  The district court rejected that argument.  *See Postmates Inc. v. 10,356 Individuals*, 2020 WL 1908302, at *5-6 (C.D. Cal. Apr. 15, 2020).  Here, that argument was never available because Intuit brought its state-law contract dispute in state court with respect to mass arbitrations involving state-law deception claims.  It was thus only by amending Petitioners' demands that Keller Lenkner could try to create federal jurisdiction over a clearly state-law dispute.

1    ***First***, Congress has prohibited the IRS from entering the tax-preparation market through

2    repeated appropriations riders throughout the Sherman Act's four-year limitations period (15 U.S.C.

3    § 15b).  *See, e.g.*, Consolidated Appropriations Act, 2019, Pub. L. No. 116-6, § 111, 133 Stat. 13,

4    146 (2019) ("no funds in this or any other Act shall be available … to provide to any person a

5    proposed final return or statement for use by such person to satisfy a filing or reporting requirement

6    under" the Internal Revenue Code); Consolidated Appropriations Act, 2016, Pub. L. No. 114-133,

7    § 112, 129 Stat. 2242, 2430 (2015) (same).  The IRS cannot be "deceived" into not taking actions

8    that Congress prohibited it from taking.

9    ***Second***, Petitioners' claim would require Intuit to have deceived the IRS about the nature of

10    a program that the agency started and has administered for the last eighteen years, including through

11    yearly audits, *see, e.g.*, Cole Decl. Ex. 15 at 56-57; *id*. Exs. 6-9.  Based on that experience, the IRS

12    has concluded, independently, that entry into the relevant market is not economically feasible.

13    Indeed, in 2010, the IRS sponsored a "feasibility study," to assess "offering its own e-filing

14    program," and "concluded it was neither cost-beneficial, nor could the IRS keep pace with the

15    innovation of the private sector," *id*. Ex. 15 at 11.  The Free File program could not have prevented

16    the IRS from doing something it was not economically feasible for the agency to do.[6]

17    ***Third***, the Supreme Court has long barred any Sherman Act claim based on "conduct …

18    aimed at influencing decisionmaking by the government."  *Octane Fitness, LLC v. ICON Health &*

19    *Fitness, Inc.*, 572 U.S. 545, 555-56 (2014).  As the Court explained in a landmark case, "deliberately

20    deceiv[ing] … public officials" is "of no consequence so far as the Sherman Act is concerned."  *E.*

21    *R.R. Presidents Conf. v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 145 (1961).  Thus, the alleged

22    conduct cannot give rise to liability under federal antitrust law.  *See, e.g.*, *id.* at 140-45.  A claim

23

24

---

25    [6] The IRS recently removed from the Free File program's governing terms the provision barring the agency's entry into the online tax-preparation market.  The IRS, however, has announced

26    no plans to enter that market, confirming the patent frivolousness of Petitioners' theory.  *See, e.g.*, *Bourns, Inc. v. Raychem Corp.*, 331 F.3d 704, 712 (9th Cir. 2003) (no antitrust claim where alleged

27    entrant was a "'nascent business'—one that is merely a gleam in the eye and a hope in the heart of its promoters"); *Bubar v. Ampco Foods, Inc.*, 752 F.2d 445, 452 (9th Cir. 1985) (no antitrust claim

28    when putative entrant was unprepared to compete).

1   squarely "foreclosed by prior [Supreme Court] decisions" cannot support federal jurisdiction.  *Steel*

2   *Co.*, 523 U.S. at 89.

3   **2.   Petitioners' theory of collective concealment is utterly implausible**

4   Petitioners' other Sherman Act claim is equally frivolous.  Petitioners assert (seemingly

5   under 15 U.S.C. § 1) that the Free File Alliance "collectively concealed the Free File product [they]

6   had promised to provide, to maximize the number of consumers who paid for tax filing services."

7   Dkt. 1-3 at 7.  For three reasons, that theory is "so insubstantial, implausible, … [and] completely

8   devoid of merit as not to involve a federal controversy."  *Steel Co.*, 523 U.S. at 89.

9   ***First***, the alleged conspiracy is frivolous because the Free File program is voluntary.  Cole

10  Decl. Ex. 15 at 6.  If a company did not want consumers to use its "Free File" product, it would not

11  need to conspire to conceal products; it could simply leave the program—as H&R Block has now

12  chosen to do.  *Id.* Ex. 17 at 3.  Nor does it make sense that companies would conceal their individual

13  Free File products "collectively" in favor of the paid tax-preparation market in general.  Intuit has no

14  interest in having consumers use H&R Block's paid service over its own Free File offer—quite the

15  opposite.  *See, e.g.*, *id.* Ex. 16 at 33 ("Brand loyalty is a salient feature of the tax preparation

16  software industry.").

17  ***Second***, the *only* fact Petitioners allege to support collusion is that Intuit's conduct "was

18  mirrored by H&R Block and [unspecified] others."  Dkt. 1-3 at 7.  But the Supreme Court has

19  foreclosed reliance on "bare assertion[s] of conspiracy" based on "parallel conduct," because such

20  conduct, by itself, "does not suggest conspiracy."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556-57

21  (2007).  "Even conscious parallelism … is not in itself unlawful."  *Id.* at 553-54 (brackets and

22  quotation marks omitted).

23  At most, Free File Alliance members might have independent interests in promoting their

24  paid services, but that cannot support a § 1 conspiracy because any parallelism has "a perfectly

25  innocuous explanation."  *In re German Auto. Mfrs. Antitrust Litig.*, 2020 WL 1542373, at *11 (N.D.

26  Cal. Mar. 31, 2020).  Each company belongs to the same non-profit coalition of tax-preparation

27  companies bound by the same IRS rules, including (1) that members may, "without limitation,"

28  market their commercial products "in the same manner as … if they were not participating in the

1   Free File program," and (2) that they have no "obligation" to market or promote the Free File

2   program.  Cole Decl. Ex. 5 § VIII.  Just as automobile manufacturers may "independently" arrive at

3   "identical decisions" not to "invest in electric vehicles" where they have "already invested heavily in

4   diesel engines," *German Auto. Mfrs.*, 2020 WL 1542373, at *11 (quotation marks omitted), tax-

5   preparation companies—having taken on the "substantial costs" of "[p]roducing tax preparation

6   software and customer service support" for their commercial products, Cole Decl. Ex. 16 at 34—

7   may independently choose to promote *those* products rather than the Free File program without

8   running afoul of federal antitrust law.  Indeed, in this case, any decision to do so was backed by the

9   express "consent of the government agency" overseeing the program.  *Byers v. Intuit Inc.*, 600 F.3d

10  286, 295 (3d Cir. 2010).[7]

11      ***Third***, even crediting the threadbare allegations, the challenged conduct would be

12  *pro*competitive, not anticompetitive.  Petitioners' claim is that the Free File Alliance steered

13  consumers *away from* Free File—a competition-restricted marketplace where every product has the

14  same price and features are limited by the IRS's rules for the program—and *into* a "highly

15  competitive" commercial market where prices are not fixed and companies compete on product

16  features not available through the IRS Free File program.  Cole Decl. Ex. 16 at 23; *see id.* at 29, 32.

17  But the Sherman Act only prohibits agreements to restrain competition or fix prices; "interbrand

18  competition" is precisely what "[t]he antitrust laws are designed … to protect," even if it "can lead to

19  higher prices" in some cases.  *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 895-

20  96 (2007).  Petitioners' theory is thus that program participants agreed to vigorously compete on

21  price and pursue unfettered innovation.  That is the opposite of an anticompetitive conspiracy subject

22  to liability under § 1.

23

24      [7]  In *Byers*, plaintiffs challenged the IRS's requirement that members provide their Free File
      offering to no more than 50 percent of eligible taxpayers.  The Third Circuit held that members were
25    entitled to "conduct-based implied antitrust immunity" for complying with that requirement,
      explaining that such immunity extends to actions "pursuant to an agreement with a government
26    agency when (1) the government agency is acting pursuant to a clearly defined policy or program;
      and (2) the private party is acting at the direction or consent of the government agency."  600 F.3d at
27    295.  Even if Petitioners' had a coherent basis for a Sherman Act claim, Intuit would be immune on
      the same ground here.
28

1   In short, Petitioners have failed to plead a nonfrivolous federal question that could support

2   this Court's jurisdiction.  The Court should accordingly deny the Motion and dismiss the Petition for

3   lack of an "independent jurisdictional basis."  *Vaden*, 556 U.S. at 59.

4   **III.   THE COURT SHOULD DECLINE TO EXERCISE JURISDICTION UNDER *COLORADO RIVER***

5   Even if the Court concludes that it has jurisdiction, it should decline to exercise that

6   jurisdiction in deference to Intuit's state-court action, based on the factors set forth in *Colorado*

7   *River Conservation District v. United States*, 424 U.S. 800 (1976).  As that case explains, a federal

8   court's discretion to decline jurisdiction in cases of concurrent state-court litigation is governed by

9   "principles … of '[w]ise judicial administration, giving regard to conservation of judicial resources

10   and comprehensive disposition of litigation.'"  *Id*. at 817 (alteration in original) (quoting *Kerotest*

11   *Mfg. Co. v. C-O-Two Fire Equip. Co.*, 342 U.S. 180, 183 (1952)).  And as the Ninth Circuit has

12   elaborated, a court's decision not to exercise jurisdiction in "exceptional circumstances" involving

13   "parallel" state and federal court litigation is guided by several factors, including:

14   > (1) which court first assumed jurisdiction over any property at stake;
15   > (2) the inconvenience of the federal forum; (3) the desire to avoid
     > piecemeal litigation; (4) the order in which the forums obtained
16   > jurisdiction; (5) whether federal law or state law provides the rule of
     > decision on the merits; (6) whether the state court proceedings can
17   > adequately protect the rights of the federal litigants; (7) the desire to
     > avoid forum shopping; and (8) whether the state court proceedings will
18   > resolve all issues before the federal court.

19   *R.R. St. & Co. v. Transp. Ins. Co.*, 656 F.3d 966, 978-79, 982-83 (9th Cir. 2011).  Applying those

20   factors—"[n]o one" of which "is … determinative," *Colorado River*, 424 U.S. at 818—numerous

21   courts have declined jurisdiction over petitions to compel arbitration.[8]

22   _____

23   [8]  *See, e.g.*, *DePuy I*, 403 F. Supp. 3d at 707-12 (petition raised a high risk of piecemeal
24   litigation, the state court obtained jurisdiction first, state law governed the arbitration agreement, and
     the state court was adequate to protect the parties' rights); *Stockton Firefighters' Local 456 v. City of*
25   *Stockton*, 2010 WL 3825674, at *4-6 (E.D. Cal. Sept. 28, 2010) (among other things, parties sought
     "determination of their rights in relation to the same contract" that was the subject of a prior state
26   suit and "no further issues" would remain in the federal case after the state suit's resolution); *THI of*
     *N.M. at Las Cruces, LLC v. Fox*, 727 F. Supp. 2d 1195, 1209-14 (D.N.M. 2010) (dispute over the
27   enforceability of a contract was governed by state law and created a risk of piecemeal litigation and
     inconsistent outcomes); *Morgan Stanley Dean Witter Reynolds, Inc. v. Gekas*, 309 F. Supp. 2d 652,

28

1      The same outcome is warranted here.  As a threshold matter, the state and federal actions

2  involve the same facts, parties, and issues and are thus "parallel" for purposes of applying the

3  *Colorado River* factors.  *DePuy II*, 953 F.3d at 477-78; *see also Nakash v. Marciano*, 882 F.2d 1411,

4  1416 (9th Cir. 1989) ("[E]xact parallelism … is not required.  It is enough if the two proceedings are

5  'substantially similar.'").  Intuit's action asks the state court to declare its rights as a "party to the

6  arbitration" under the contract.  TOS § 14.  The Petition seeks to foreclose that equitable relief, in

7  effect depriving Intuit of its contractual rights.  And there is no meaningful difference between the

8  parties to the two cases.  Petitioners are a subset (consisting of less than 55%) of the defendants in

9  the state-court action—all represented by the same law firm.  Identical grounds for compelling

10  arbitration therefore could have been presented to the state court.  In fact, Petitioners' counsel

11  presumably *will* make these same arguments to the state court on behalf of the remaining defendants

12  regardless of the outcome of this case.  The Petition is thus "but a 'spin-off' of more comprehensive

13  state litigation."  *Nakash*, 882 F.2d at 1417.  As discussed below, only the state court therefore can

14  provide a single forum for resolving all the issue as to all the parties, including Petitioners, raised in

15  the parallel federal action here.

16      The remaining *Colorado River* factors weigh decisively against exercising federal

17  jurisdiction.  While there is no property at stake and convenience is not a factor, the order in which

18  the courts obtained jurisdiction, the controlling law, and the adequacy of the state court to protect the

19  parties' rights all weigh against duplicative jurisdiction.  Intuit's state-court action was filed earlier,

20  so the Los Angeles Superior Court obtained jurisdiction first.  The disputes that Petitioners wish to

21  preclude the state court from deciding concern contractual rights that are generally governed by

22  California law.  *See* TOS § 13; *see also DePuy I*, 403 F. Supp. 3d at 710 ("If California law applies,

23  this factor clearly weighs in favor of abstention.").  And the state court can fully protect the federal

24  interest in the enforceability of such agreements on a motion to compel brought in that forum.  *See*

25  ──────────────────────────

26  657-61 (M.D. Pa. 2004) (petition created a risk of piecemeal litigation and a "specter of
impermissible forum shopping"); *CIGNA HealthCare of St. Louis, Inc. v. Kaiser*, 181 F. Supp. 2d

27  914, 925-28 (N.D. Ill.) (identical parties were subject to a parallel state suit, so a federal suit would
be an "unnecessary duplication of judicial effort," and the state court could adequately protect

28  petitioner's rights), *aff'd*, 294 F.3d 849 (7th Cir. 2002).

1   Cal. Code Civ. Proc. § 1281.2; *see also Vaden*, 556 U.S. at 59 ("[S]tate courts have a prominent role

2   to play as enforcers of agreements to arbitrate.").  There is thus "no question that the state court has

3   authority to address the rights and remedies at issue in this case."  *R.R.*, 656 F.3d at 981.

4          Likewise, the desire to avoid piecemeal litigation and the ability to resolve all issues in state

5   court heavily weigh against exercising federal jurisdiction.  Not only is piecemeal litigation virtually

6   certain here; it appears to have been the primary purpose of the Petition.  Petitioners could have

7   responded to Intuit's suit in state court by raising the same arguments asserted here as reasons for the

8   state court to compel arbitration.  Petitioners instead chose to file this new federal case on behalf of

9   only a subset of the state court defendants.  As a result, even if the Court were to grant the Petition,

10  Intuit would still have to litigate the same issues in state court against the remaining defendants.  By

11  "splintering this litigation" into two cases, involving substantially but not completely overlapping

12  parties, Petitioners have deliberately "create[d] a high risk of inconsistent results and wasteful

13  duplication."  *DePuy II*, 953 F.3d at 478.  In contrast, the state court hearing Intuit's action is

14  situated to resolve the same issues at once as to all 9,933 defendants, including Petitioners.

15         The strategy behind Petitioners' choices is plain:  They have attempted to manufacture a

16  forum in which they can take a first bite at their arbitrability arguments.  Even if the Court denies the

17  Petition on the merits, opposing counsel will presumably try to relitigate the same issues in state

18  court as to the remainder (if not all) of the defendants—again, "risk[ing] … inconsistent results and

19  wasteful duplication."  *DePuy II*, 953 F.3d at 478.  Given the "'highly interdependent' relationship"

20  between Petitioners' arbitrability arguments and Intuit's claims, those arguments are best heard in a

21  single forum that can "resolve all issues" and achieve "the goal of 'comprehensive disposition of

22  litigation.'"  *R.R.*, 656 F.3d at 979, 983 (quoting *Colorado River*, 424 U.S. at 817, 819).  Declining

23  jurisdiction will thus allow the state court to settle the parties' dispute in its entirety, conserve

24  judicial resources, and avoid the need for fragmented proceedings.  *See Montanore Minerals Corp.*

25  *v. Bakie*, 867 F.3d 1160, 1170 (9th Cir. 2017) (directing district court to decline jurisdiction where

26  "state court could have resolved all issues before the federal court, and judicial resources would have

27  been saved and duplicative litigation prevented").

28

Finally, declining federal jurisdiction in deference to the state court avoids rewarding blatant forum shopping.  As discussed, Petitioners filed their federal case within hours of amending their arbitration demands to add federal antitrust claims.  *See supra* pp. 9-10, 17-18.  In many cases, those demands had been pending for many months.  Petitioners then immediately moved to stay Intuit's state court action.  The "decision to open a second front," *DePuy II*, 953 F.3d at 479, allows Petitioners to get an extra bite at defeating Intuit's claims in a federal forum, *supra* p. 24, and it delays the state-court case by requiring an initial foray through federal court, creating a greater chance that Intuit will be coerced into settling as fees become due before the AAA.  *See DePuy II*, 953 F.3d at 479.  Declining to exercise jurisdiction serves to discourage tactics like these that, if not outright "vexatious," are "opportunistic and … manipulative."  *Id.*

Moreover, to the extent the Petition seeks to prevent Intuit from litigating its claims in state court, that requested relief "is tantamount to [an order] enjoining the proceedings," *Bennett v. Medtronic, Inc.*, 285 F.3d 801, 805 (9th Cir. 2002), and hence is barred by the Anti-Injunction Act, which generally prohibits federal courts from "grant[ing] an injunction to stay [state court] proceedings," 28 U.S.C. § 2283.  While Petitioners have not formally sought to enjoin Intuit's state-court action, the Anti-Injunction Act "cannot be evaded by addressing the order to the parties" rather than the state court itself.  *Atl. Coast Line R.R. Co. v. Bhd. of Locomotive Eng'rs*, 398 U.S. 281, 287 (1970); *see also* 17A Wright & Miller, *Federal Practice and Procedure* § 4222 n.14 (3d ed. 2020) (collecting cases).  The Petition expressly seeks an order compelling arbitration and "making clear that Intuit must raise [its] arguments … before individual arbitrators" *rather than in state court*.  Pet. ¶ 38.  Under the Anti-Injunction Act, this Court may not preclude Intuit from making arguments to the state court absent limited exceptions that Petitioners have not invoked and that do not apply to this case.  *See* 28 U.S.C. § 2283 (permitting injunctions "expressly authorized" by Congress, "in aid of" the federal court's jurisdiction, or "to protect or effectuate its judgments"); *see Negrete v. Allianz Life Ins. Co. of N. Am.*, 523 F.3d 1091, 1100-03 (9th Cir. 2008).  Thus, to the extent Petitioners ask the Court not only to compel arbitration *but to block litigation*, that is precisely the "unseemly interference with state court proceedings" the Anti-Injunction Act was "designed to preclude." *Negrete*, 523 F.3d at 1100.

1 | IV.    **NONE OF INTUIT'S STATE-COURT CLAIMS IS SUBJECT TO ARBITRATION**

2      Lastly, the Petition fails on the merits because neither of the purported disputes Petitioners

3 seek to compel Intuit to arbitrate entails any ambiguity for the arbitrator to resolve.  The rights here

4 are clear:  The contract expressly incorporates the AAA rules, which give any party to a consumer

5 arbitration the right to elect small claims court before an arbitrator is appointed.  Likewise, the

6 contract unequivocally prohibits class or representative proceedings.  Petitioners seek to nullify

7 those rights by manufacturing disputes for individual arbitrators to decide thousands of times over—

8 all to leverage arbitration fees to coerce a global settlement.  But the "first principle" of the FAA is

9 that "arbitration is strictly a matter of consent."  *Lamps Plus*, 139 S. Ct. at 1415 (quotation marks

10 omitted).  "Consent is essential … because arbitrators wield only the authority they are given."  *Id.* at

11 1416.  Thus, "the federal policy is simply to ensure the enforceability, *according to their terms*, of

12 private agreements to arbitrate."  *Volt*, 489 U.S. at 476 (emphasis added).

13      Here, where the parties contracted for either party to elect small claims court and agreed to

14 forgo class-wide proceedings, the "task" under the FAA is the "same" as in any contract dispute:  "to

15 give effect to the intent of the parties."  *Lamps Plus*, 139 S. Ct. at 1416.  Intuit's state-court action

16 seeks to do precisely that.  It asks the state court not to address the merits of Petitioners' claims, but

17 only to declare the parties' rights with respect to pending arbitrations—consistent with the express

18 contractual language authorizing "any party to the arbitration … [to] seek … equitable relief from

19 any court of competent jurisdiction" in aid of arbitration, TOS § 14; *see Dohrmann*, 2020 WL

20 4601254, at *2 (construing § 14 to bar judicial determination of "merits," but to permit "equitable

21 relief in aid of arbitration").  Because there is no ambiguity, Petitioners' effort to forestall the state

22 court's declaration of Intuit's rights should be rejected.

23      **A.  Intuit Has A Clear Right To Elect Small Claims Court Under Consumer Rule 9(b)**

24      Intuit's right to elect small claims court under Consumer Rule 9(b) does not present a

25 contractual ambiguity for an arbitrator to resolve.  "Parties may generally shape [arbitration]

26 agreements to their liking by specifying," among other things, "the rules by which they will

27 arbitrate."  *Lamps Plus*, 139 S. Ct. at 1416.  As *Volt* illustrates, when the contract incorporates rules

28 that provide a right *not* to arbitrate under certain circumstances, "application of the FAA to prevent

1   enforcement of those rules would actually be 'inimical to the policies underlying [the FAA],'

2   because it would 'force the parties to arbitrate in a manner contrary to their agreement.'"  489 U.S. at

3   472.  In *Volt*, a state trial court determined that the parties' arbitration agreement incorporated a state

4   rule authorizing a stay of arbitration under certain circumstances and, based on those circumstances,

5   entered a stay and denied the defendant's petition to compel arbitration of the dispute.  The Supreme

6   Court affirmed, explaining that:

> Where, as here, the parties have agreed to abide by state rules of arbitration, enforcing those rules according to the terms of the agreement is fully consistent with the goals of the FAA, even if the result is that arbitration is stayed where the Act would otherwise permit it to go forward.  By permitting the courts to "rigorously enforce" such agreements according to their terms, we give effect to the contractual rights and expectations of the parties, without doing violence to the policies behind by the FAA.

12  *Id*. at 479 (citation omitted).

13          Here, as in *Volt*, Intuit seeks to enforce in state court a clear contractual right.  Under

14  California law—which the parties designated under their choice-of-law provision, TOS § 13—"[t]he

15  language of a contract is to govern its interpretation, if the language is clear and explicit, and does

16  not involve an absurdity."  Cal. Civ. Code § 1638.  The parties' contract clearly and explicitly

17  incorporates the AAA rules by providing that "[a]rbitration will be conducted … under the AAA

18  rules."  TOS § 14.  In construing such "AAA incorporation clause[s]," courts "must give full effect

19  to the plain meaning of the language of that clause," which is that "the rules apply in full" unless the

20  parties "explicitly" agree otherwise.  *RLI Ins. Co. v. Kansa Reinsurance Co., Ltd.*, 1991 WL 243425,

21  at *3 (S.D.N.Y. Nov. 14, 1991).  The AAA rules, in turn, give "either party" the "cho[ice]" to take

22  qualifying claims to small claims court, including by serving a notice of election under Rule 9(b)

23  "before the arbitrator is … appointed."  AAA R-9.  Rule 9(b) mandates that, upon receipt of such

24  notice, the AAA will "administratively close the case."  *Id*.  Upon Intuit's election of small claims

25  courts for Petitioners' claims, the AAA was thus required to close Petitioners' cases.

26          Petitioners have never contested that the contract incorporates the AAA rules, that Intuit

27  properly invoked Rule 9(b), or that Rule 9(b) requires the AAA to close cases in which a party elects

28

small claims court.  Their sole contention—and thus the basis of the "dispute" in state court—was that the Terms of Service supposedly "prohibited" Intuit from making "such an election" by telling consumers that "ANY DISPUTE OR CLAIM RELATING IN ANY WAY TO THE [SERVICES] OR THIS AGREEMENT WILL BE RESOLVED BY BINDING ARBITRATION, RATHER THAN IN COURT, except that you may assert claims in small claims court if your claims qualify." Dkt. 7-1 at D-5 (emphases deleted, and quotation of TOS § 14 corrected).  That provision, however, does not displace any AAA rule—much less "explicitly," as would be required to "alter" or "repudiate" rules incorporated into the contract, *RLI*, 1991 WL 243425, at *3.  To the contrary, the obvious purpose of the provision is to implement the AAA's own directive to provide "notice" to consumers that their claims will be decided in arbitration except that a party may "make use of applicable small claims court procedures as an alternative," AAA Due Process Princ. 11(c).

Even if the notice provision were in tension with the rules provision, a "cardinal principle of contract construction" is "that [the] document should be read to give effect to all its provisions and to render them consistent with each other." *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 63 (1995); *accord* Cal. Civ. Code § 1641 ("The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other.").  Thus, in *Mastrobuono*, the Supreme Court rejected a reading of a contract that pitted two provisions against each other:  "one foreclosing punitive damages, the other allowing them." 514 U.S. at 64.  That reading, the Court held, was "untenable" where the provisions could easily be "harmonize[d]." *Id*. at 63-64.

Here, there is no conflict between the notice and rules provisions.  The notice provision apprises consumers of the scope of claims subject to arbitration, including the exception for "qualify[ing]" claims that consumers "may assert" in small claims court.  TOS § 14.  The rules provision, meanwhile, gives "either party" the unilateral right to elect small claims court before an arbitrator is appointed, AAA R-9(a)-(b), even "[a]fter a case is filed with the AAA," AAA R-9(b). *Cf., e.g.*, *RLI*, 1991 WL 243425, at *3 (holding that AAA rule governing nationality of arbitrators controlled where parties' agreement addressed other qualifications but was "silent" as to nationality). And the rules mandate that the AAA "will administratively close the case" in that situation.  AAA R-

9(b).  Intuit's choice to elect small claims court, however, does not change that Petitioners "may assert" their claims in small claims court, exactly as the notice provision says.  TOS § 14.

Other provisions of the contract confirm this commonsense, plain-meaning reading.  Where the contract waives a party's right, it does so explicitly, saying in the same provision, for example, that:

> YOU AGREE THAT YOU AND INTUIT ARE EACH WAIVING THE RIGHT TO FILE A LAWSUIT AND THE RIGHT TO A TRIAL BY JURY. IN ADDITION, YOU AGREE TO WAIVE THE RIGHT TO PARTICIPATE IN A CLASS ACTION OR LITIGATE ON A CLASS-WIDE BASIS. YOU AGREE THAT YOU HAVE EXPRESSLY AND KNOWINGLY WAIVED THESE RIGHTS.

TOS § 14.  Likewise, where the contract purports to supplement the AAA's rules, it says so expressly:  "Payment of all filing, administration and arbitrator fees and costs will be governed by the AAA's rules, but if you are unable to pay any of them, Intuit will pay them for you."  *Id*.  The notice provision that Petitioners rely on does not refer to the AAA rules, much less expressly waive any right provided by those rules.

Before the AAA, Petitioners argued that the notice provision waives Intuit's right to elect small claims court because it refers to "you," *i.e.*, the consumer, having that right.  Dkt. 7-1 at D-5.  That reading suffers from several fatal defects.

***First***, it ignores the actual language of the notice provision, which does not say that "you *alone* may *elect* small claims court."  Nor does it say, "And we [Intuit] waive our right under Rule 9(b) to elect small claims court for qualifying claims that you submit for arbitration."  Under blackletter contract law, "courts may not rewrite agreements and impose terms" to which the parties did not agree.  *Sonic-Calabasas A, Inc. v. Moreno*, 57 Cal. 4th 1109, 1143 (2013); *accord Hinckley v. Bechtel Corp.*, 41 Cal. App. 3d 206, 211 (1974) ("[C]ourts are not at liberty to revise an agreement under the guise of construing it."); 11 *Williston on Contracts* § 31:5 (4th ed. 2020) ("[C]onstruction of a contract does not include its modification.").  As illustrated above, when the contract means to waive a right or vary a rule (for the consumer or Intuit or both), it does so by expressly referring to the right being waived or to the rules being supplemented or modified in some respect.

***Second***, Petitioners' reading involves an "untenable" conflict.  *Mastrobuono*, 514 U.S. at 64. The notice provision, on its face, does not purport to qualify the incorporation of Rule 9 under the rules provision.  Any reasonable reading must avoid creating a conflict where there is none.  *See id.* at 63-64; Cal. Civ. Code § 1641; *supra* p. 28.

***Third***, Petitioners' reading would require concluding that Intuit agreed to pay $3,200 in fees for claims, however small the amount at issue, because a consumer would *prefer* to arbitrate them—even though all the same relief is available to the consumer in small claims court at a fraction of the cost to both parties.  Courts must construe even ambiguous terms to avoid, not create, "absurdity." Cal. Civ. Code § 1638; *see also, e.g.*, *Segal v. Silberstein*, 156 Cal. App. 4th 627, 634-35 (2007) (construing arbitration agreement to avoid "absurd[ity]" that "business … agree[d]" to "increased costs and delays" of out-of-state litigation with no fee-shifting while requiring in-state arbitration with mandatory fee-shifting).

***Fourth***, Petitioners' construction would violate the AAA's due-process standards, under which "*[a]ll* parties" to a consumer dispute "are entitled to a fundamentally-fair ADR process" that includes "access to small claims court."  AAA Due Process Princ. 1 cmt. (emphasis added); *accord id.*, Princ. 5; AAA Consumer Arbitration Fact Sheet.  And AAA rules provide that the organization may only "administer[] consumer disputes that *meet* the due process standards."  AAA R-1(d) (emphasis added); *cf., e.g.*, Decl. of Warren Postman ¶ 8, *In Re Daily Fantasy Sports Litig.*, No. 1:16-md-02677 (D. Mass Nov. 11, 2019) (Dkt. 400-2) (reporting that AAA would not administer consumer disputes governed by provisions that violate due process unless the provisions were waived).  Hence, if Petitioners' reading were correct, AAA rules would still require that the cases be closed.  The AAA's determination that the parties' contract "complies with the due process standards" confirms that the contract must not eliminate either party's access to small claims court. Dkt. 7-1 at D-35.

Petitioners' fallback argument before the AAA—that there is an "ambigu[ity]" for the arbitrator to resolve, Dkt. 7-1 at D-5—fares no better.  For all the reasons given, there is no ambiguity.  At bottom, Petitioners contend that their manufactured dispute about the meaning of the notice provision requires Intuit to pay millions of dollars in fees for "individually empaneled

1    arbitrators" to decide thousands of times whether fees were owed for claims that no one disputes

2    Petitioners "'may assert'" in small claims court.  *Id*. (quoting TOS § 14).  That defies reason.

3    Intuit's right to invoke Rule 9(b), by definition, applies only "*before* the arbitrator is formally

4    appointed."  AAA R-9(b) (emphasis added).

5          The only determination that can be made regarding small claims court "*[a]fter* the arbitrator

6    is appointed" is governed not by Rule 9(b), but by a separate provision that leaves it up to the

7    arbitrator's discretion whether "the case should be decided in arbitration or … in small claims

8    court."  AAA R-9(c) (emphasis added).  And the AAA rules do not provide for the arbitrator to

9    refund or reallocate fees where a case is sent to small claims court after an arbitrator is appointed.

10   The point of Rule 9(b) is to give either party the right to avoid incurring those costs for the

11   appointment of arbitrators in the first place.  Petitioners' argument that there is an arbitrable dispute

12   about the meaning of the contract still imposes the same unfounded result—that Intuit has no right to

13   invoke Rule 9(b) and must pay millions of dollars to arbitrate these cases.

14         Citing the Ninth Circuit's decision in *Lifescan*, Petitioners contend (at 9, 12-13) that Intuit

15   "must comply" with the AAA's decision to leave the issue to arbitrators.  *Lifescan* is indeed

16   "illustrative," *id*. at 12, but what it illustrates is why the AAA's determination cannot stand.  There,

17   the arbitration between Lifescan and Premier broke down after Premier was unable to pay its share

18   of the arbitration fees, and the AAA gave Lifescan the option to advance those fees so that the final

19   hearings could go forward.  *See Lifescan*, 363 F.3d at 1011.  Lifescan refused, the AAA suspended

20   the hearings, and Lifescan filed a petition to compel arbitration—which the district court granted,

21   ordering Premier to pay its pro-rata share of the fees.  *Id*. at 1013.  The Ninth Circuit reversed.  The

22   problem with Lifescan's theory, the Ninth Circuit explained, was that the contract did not *require*

23   Premier to pay a pro-rata share before the hearing.  Rather, the contract incorporated AAA rules that

24   provided "only that the AAA *may* require a deposit as it deems necessary," thereby leaving the issue

25   to the AAA's "discretion."  *Id*. at 1012-13.

26         Here, the contract likewise incorporates the AAA rules, but the rule at issue leaves the AAA

27   *no discretion*.  To the contrary, Rule 9(b) provides that either "party can send a written notice … that

28   it wants the case decided by a small claims court," and "[a]fter receiving this notice, the AAA *will*

administratively close the case."  AAA R-9(b) (emphasis added).  "The word 'will,' like the word 'shall,' is a mandatory term."  *NRDC v. Perry*, 940 F.3d 1072, 1078 (9th Cir. 2019).  The only discretion under Rule 9(b) belongs to the parties, who "may choose" to remove a case to small claims court "before the arbitrator is formally appointed to the case."  AAA R-9.  In this case, "enforcing [the AAA's] rules according to the terms of the agreement," *Volt*, 489 U.S. at 479, therefore means declaring that the AAA was required to close Petitioners' arbitrations in deference to Intuit's election of small claims court—the precise relief that Intuit seeks in state court.

Petitioners argue (at 10-11, 12-13) that this is a threshold arbitrability dispute, which is itself subject to arbitration under Rule 14(a).  But Rule 14(a) applies only to disputes over the arbitrator's "jurisdiction," such as "the existence, scope, or validity of the arbitration agreement."  AAA R-14(a).  No such dispute is implicated here, where everyone agrees that the contract is valid and that Petitioners' claims *could* be arbitrated *absent* Intuit's small-claims-court election.  The relevant AAA rule that governs interpretive authority with respect to the AAA rules is Rule 53, which makes clear that the arbitrator has no authority to interpret and apply Rule 9(b).  Rather, as commonsense dictates, the arbitrator can only interpret and apply the rules "as they relate to the arbitrator's powers and duties."  AAA R-53.  Rule 9(b) is exclusively directed to election of small claims court before the arbitrator is appointed, and thus falls under "other" rules that must "be interpreted and applied by the AAA" itself rather than the arbitrator.  *Id*.  That is why Rule 9(b) directs *the AAA*, not the arbitrator, to close cases like Petitioners' in which such an election is made.  It is also why an arbitrator, once appointed, has no power to restore a party's unilateral right to elect small claims court under Rule 9(b).  *Cf.* AAA R-9(c).

In sum, the sole "dispute" here is whether the contract's plain terms required the AAA to close Petitioners' arbitrations.  Where the AAA gets a question like that wrong, the only interest of the FAA lies in enforcing the terms of the parties' agreement, not in "forc[ing] the parties to arbitrate in a manner contrary to their agreement."  *Volt*, 489 U.S. at 472; *see also id*. at 478-79.

**B.  The Prohibition On De Facto Class Proceedings Is Not Subject To Arbitration**

Nor does Intuit's claim that Petitioners and Keller Lenkner's thousands of other "clients" are proceeding as a de facto class present a dispute for the arbitrator.  The parties agree that there is a

valid class-action waiver.  They dispute only whether it is being violated.  There is therefore no contractual ambiguity for the arbitrator to resolve.  As this Court has recognized, a class waiver extends to proceedings that have the "substance and function" of a class proceeding, even if not the "form."  *AT & T Mobility LLC v. Bernardi*, 2011 WL 5079549, at *6 (N.D. Cal. Oct. 26, 2011).  It is immaterial, then, that Petitioners "nominally filed their arbitration demands as individuals, and do not explicitly purport to represent anyone but themselves individually."  *Id.*  The issue to be determined in Intuit's state-court action is whether these mass arbitrations exhibit "the critical hallmarks of class and representative actions, and thus, run afoul of the agreement's prohibition of 'any form of a representative or class proceeding.'"  *Id.*

That dispute is necessarily for the state court, not an arbitrator, to decide.  Intuit has not agreed to arbitrate on a de facto class basis.  Requiring Intuit to arbitrate whether these coordinated mass arbitrations are functionally a class action would be tantamount to imposing class-based arbitration, in violation of the FAA's most "basic precept that arbitration 'is a matter of consent, not coercion.'"  *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 681 (2010).  The effect here would be analogous to the situation the Supreme Court confronted in *Lamps Plus*.  There, the district court granted a motion to compel, but in so doing "authoriz[ed] arbitration on a classwide," rather than individualized, "basis."  139 S. Ct. at 1413.  The Ninth Circuit affirmed, applying the doctrine of *contra proferentem* to infer consent by the drafting party to class arbitration.  *Id.* at 1417.  The Supreme Court reversed, explaining that it is one thing to compel "the 'traditional individualized arbitration' envisioned by the FAA," *id.* at 1412, but quite another to compel *class* arbitration, which involves "a 'fundamental' change … that 'sacrifices the principal advantage of arbitration' and 'greatly increases risks to defendants,'" *id.* at 1414.  "Neither silence nor ambiguity," the Court held, "provides a sufficient basis for concluding that parties to an arbitration agreement agreed to undermine the central benefits of arbitration itself."  *Id.* at 1417.

Petitioners point (at 10-11) to the scope of the arbitration clause and the incorporation of Rule 14(a).  But neither is sufficient to establish consent to having an arbitrator determine whether Petitioners and thousands of other individuals are using *the arbitral process itself* as a means to circumvent the class waiver and create a de facto class action.  To be sure, the language of the

1    arbitration agreement is "[b]road," covering "'any dispute or claim relating in any way to the

2    services' offered by TurboTax." Mot. 1, 11 (quoting TOS § 14).  But broad language does not imply

3    specific consent to a determination on Intuit's de facto class arbitration claim—especially where, as

4    here, the contract unequivocally bars such a proceeding.  The incorporation of Rule 14(a) does not

5    change that.  That rule broadly delegates to the arbitrator threshold disputes over the arbitrator's

6    jurisdiction.  But it is completely silent on the specific subject of class arbitration.  AAA R-14(a).

7    As the Supreme Court has repeatedly emphasized, "class-action arbitration changes the nature of

8    arbitration to such a degree that it cannot be presumed the parties consented to it by simply agreeing

9    to submit their disputes to an arbitrator." *Stolt-Nielsen*, 559 U.S. at 685.  "[F]or that reason, …

10   courts may not infer consent to participate in class arbitration absent an affirmative 'contractual basis

11   for concluding that the party agreed to do so.'" *Lamps Plus*, 139 S. Ct. at 1416 (quoting *Stolt-*

12   *Nielsen*, 559 U.S. at 684).  To confer authority on an arbitrator to decide class arbitrability issues, the

13   contract must clearly state that the parties agree to submit to class proceedings.  The Terms of

14   Service say the opposite.

15          None of this, of course, suggests that Intuit may ignore individual arbitration demands on the

16   view that they constitute a de facto class action.  And Intuit has not done so.  As discussed, Intuit has

17   submitted to the individual arbitrations, seeking to resolve them in a manner expressly provided for

18   in the contract.  *Supra* pp. 11-16.  As a "party to the arbitration," however, Intuit is entitled to seek

19   "equitable relief" to enforce the contract, "[n]otwithstanding anything to the contrary."  TOS § 14.

20          **C.  Petitioners Effectively Concede That Intuit's Preemption Claim Is Not Arbitrable**

21          Petitioners present no arbitrability argument regarding Intuit's claim that SB 707 is

22   preempted by the FAA.  They argue (at 8) only that the claim is not ripe unless "Intuit plans to

23   withhold the fees required to proceed with Petitioners' arbitrations."  They are, of course, free to

24   make that argument to the state court, but it offers no basis to compel arbitration of any part of

25   Intuit's state-court action.  And it is meritless.  Intuit has already paid $3 million for the 9,933

26   arbitrations at issue in the state court and, absent judicial intervention, faces over $28.8 million in

27   additional fees for the AAA to continue administering the cases and appoint arbitrators.  *See* Cole

28   Decl. ¶¶ 25-26.

1    In the meantime, Keller Lenkner has withdrawn thousands of cases for which Intuit already

2  paid hundreds of thousands of dollars in fees.  Intuit should never have had to pay fees for claimants

3  who, for example, were not TurboTax customers, paid nothing to use TurboTax, or were ineligible

4  for Intuit's Free File offer.  But SB 707's coercive sanctions apply regardless of the merits of the

5  arbitration demand, leaving Intuit a lose-lose choice:  (1) pay millions of dollars for arbitrations that

6  should have been closed (and never brought) or (2) face monetary and other sanctions in court,

7  including contempt.  Declaratory-judgment statutes like the one Intuit has invoked in state court

8  exist precisely to free parties of "[t]he dilemma posed by that coercion."  *MedImmune, Inc. v.*

9  *Genentech, Inc.*, 549 U.S. 118, 129 (2007).  Intuit's state-court action should be allowed to proceed

10  so that all the parties there, including Petitioners, can resolve their rights with respect to these

11  pending mass arbitrations.

12                                                      **CONCLUSION**

13    For the reasons above, the Court should deny Petitioners' Motion and dismiss the Petition.

14  Dated:  August 12, 2020                              Respectfully submitted,

15                                                        */s/ Jonathan E. Paikin*

16    Rodger R. Cole (SBN 178865)          Jonathan E. Paikin (*pro hac vice*)
    FENWICK & WEST LLP                    David Gringer (*pro hac vice*)
17    Silicon Valley Center                Benjamin Chapin (*pro hac vice*)
    801 California Street                  Kevin M. Lamb (*pro hac vice*)
18    Mountain View, CA 94041              WILMER CUTLER PICKERING
                                             HALE AND DORR LLP
19                                         1875 Pennsylvania Avenue NW
    Molly R. Melcher (SBN 272950)        Washington, DC 20006
20    FENWICK & WEST LLP
    555 California Street, 12th Floor
21    San Francisco, CA 94104              Matthew Benedetto (SBN 252379)
                                         WILMER CUTLER PICKERING
22                                           HALE AND DORR LLP
                                         350 South Grand Ave. Suite 2100
23                                         Los Angeles, CA 90071

24                                         *Attorneys for Respondent Intuit Inc.*

25

26

27

28